626 A.2d 406

EDWARD J. WYZYKOWSKI, GALE WYZYKOWSKI, AND JACQUE-
LINE CATLEY, PLAINTIFFS–RESPONDENTS, v. ROBERT E.
RIZAS, DEFENDANT–APPELLANT, AND THE PLANNING
BOARD OF THE TOWNSHIP OF NEPTUNE, DEFENDANT.

Argued November 30, 1992—Decided June 29, 1993.

510

*John P. Quirke* argued the cause for appellant.

*William H. Oliver, Jr.,* argued the cause for respondents.

The opinion of the Court was delivered by

O'HERN, J.

The main questions in this appeal are: (1) whether the provision in a municipal ordinance of apartments as an accessory use to commercial uses authorizes a mixed-use project in which the commercial uses and the apartment uses have no relationship other than that they are in the same structure; and (2) whether planning board members appointed by a mayor have thereby a "personal or financial interest," *N.J.S.A.* 40:55D–23.b., in the outcome of a development application submitted by the mayor in a private capacity, or conversely, whether the appointive power or official status disables the mayor from appearing before such members. We hold that the enumeration of apartments as an accessory use to commercial uses, without more, contemplates that the apartments and the primary use have some relationship other than that they are in the same building or structure. We also hold that one of the planning board members had a disqualifying interest in the outcome of the application. We thus affirm in part and modify in part the judgment of the Appellate Division invalidating the development approvals and remanding the matter to the planning board. Because a variance will be required, the matter

must be submitted to the zoning board of adjustment for approval of a use not permitted by the zoning code. Although we need not now pass on all of the issues concerning the status of the mayor or planning board members appointed by him (the subject mayor's term of office has since expired), we have reservations that the opinion below may have been overbroad insofar as it suggests that the appointive status of planning board members might automatically create a "personal or financial interest" sufficient to disqualify them from acting in matters involving the mayor as a private citizen or to disqualify the mayor from appearing before them in such capacity. We expect that the Local Government Ethics Law, *N.J.S.A.* 40A:9–22.1 to –22.25, enacted after the circumstances of this case, will provide clearer guidance for local officials in the future.

## I

For purposes of this appeal, we accept generally the version of the case set forth in the briefs of defendant Robert E. Rizas ("Rizas" or "the Mayor"). Rizas was the Mayor of the Township of Neptune in 1989 when he filed an application with the Neptune Township Planning Board ("the Board") to develop a previously-vacant lot on Lawrence Avenue in the Ocean Grove section of the Township. The property is located in the Historic District–Commercial Zone ("the HD–C zone") and meets the zone's lot-size requirements. Plaintiffs, the Wyzykowskis, are nearby property owners.

The original application proposed the construction of a three-story building comprised of eleven residential units and one office space. The application envisioned the one office space and two residential units on the first floor and the remaining residential units on the second and third floors.

At a March 22, 1989, hearing, plaintiffs argued that the HD–C zone required a "principal" use that must be commercial in

nature and permitted only residential uses that were "accessory" to the principal use. They challenged the jurisdiction of the Board because the "principal" use of the property envisioned in defendant's application was residential and therefore defendant required a use variance that could be granted only by the board of adjustment. They also raised an off-street-parking issue.

Rizas argued that the proposed structure provided uses that were compatible with the ordinance because the ordinance did not define what percentage of the building must be a "principal" use to be in compliance. He also contended that residential uses were permitted "accessory" uses and therefore did not have to meet the usual test of being related, or incidental, to the "principal" use. After discussion, the Board continued the matter to its meeting of May 24, 1989.

Prior to the meeting of May 24, 1989, Rizas filed a revision to the site-plan application with the Board to increase the commercial use by dedicating the entire first floor of the structure to three offices and reducing the number of residential units from eleven to six, all to be located on the second and third floors. To accommodate concerns about off-street parking, the building was relocated on the lot in order to create five off-street parking spaces and one space for drivers with disabilities. Both the original application and the revision contained a request for one variance that would eliminate a loading space otherwise required by the ordinance. All other bulk requirements of the ordinance were satisfied by the original application and the revision.

The Law Division denied a preliminary request by plaintiffs to restrain the Board and permitted the May 24, 1989, hearing to go forward. The Board determined that it had jurisdiction, that the revisions to the application had been properly filed, and that a new notice was not necessary. The May 24, 1989, meeting was continued until July 26, 1989. However, prior to that date the Board scheduled a special meeting on July 12, 1989. The Board concluded, after hearing the available testi-

mony on July 12, including Rizas' introduction of a variety of exhibits, that the hearing would be continued to the meeting on July 26, 1989, to allow for production of additional testimony that the plaintiffs desired and to permit anyone who had intended to be present on July 26 and who was unaware of the substituted July 12 date to be present and to give testimony.

On the zoning map, two HD–C zones exist, one that includes the Lawrence Avenue property near State Highway 71 and the other in the downtown business district. At the July 12 meeting, Rizas produced a series of photos depicting properties in the downtown business zone of Ocean Grove that were, typically, three or four-story structures, the first floor housing commercial businesses and the floors above, residential apartments. Rizas submitted other exhibits that identified the area of the HD–C zone as it is fully developed in the downtown or central business area and also identified the existing uses in the HD–C zone on Lawrence Avenue where the subject property is located. The exhibits also identified the uses in the residential zone across the street from the subject property.

Rizas argued that because the first zoning ordinance affecting Ocean Grove had been adopted in 1979, at a time when the downtown business area was fully developed, one could reasonably assume that the Township planners had intended to provide in the zoning ordinances for the uses that were then in existence. The Appellate Division's opinion recited the background to the ordinance:

"Founded in 1869 by Methodists as a religious summer colony, the town of Ocean Grove was for 100 years run by the Methodist Camp Meeting Association. In 1979 the state supreme court declared Ocean Grove's government unconstitutional, and Ocean Grove became part of Neptune Township. At that point most of the community's strictly enforced blue laws, which included Sunday prohibitions against driving (the gates leading into the community were closed at midnight Saturday), bicycle riding, boating, swimming, and hanging laundry outside, no longer applied. It is still the case, however, that no alcoholic beverages can be sold or served, and that no one is allowed on the beach on Sundays until the church service is over. Many residents of the community, which has a population of about 6,000 in winter and 30,000 in

summer, are supporting movements either to secede from Neptune or to get the township to issue special ordinances that apply only to Ocean Grove."

[*Wyzykowski v. Rizas*, 254 *N.J.Super.* 28, 37–38 n. 1 [603 *A.*2d 53] (1992) (quoting B. Westergaard, *A Guide to the State* 249–51 (Rutgers 1987)).]

In addition, that court noted that Ocean Grove's historic district is

"distinguished by its generally homogeneous Victorian look. Permanent tents (actually houses extended in the summer by tents) are clustered around the Great Auditorium; there are fine old hotels with porches on Ocean Ave.; the street signs are made of tile."

[*Ibid.*]

Rizas sought to show by the exhibits that his project was consistent with the existing uses in the fully-developed downtown business area and to illustrate that the 1979 ordinance intended that type of use when it provided for "principal" commercial uses and "accessory" residential uses in the HD–C zone. Although not all of the uses on Lawrence Avenue in the vicinity of the subject property are of the same character as those in the fully-developed downtown business area, the HD–C ordinance applies to both areas of Ocean Grove.

Plaintiffs' experts concentrated on the issue of "principal" versus "accessory" use. In addition, they discussed a number of traditional site-plan issues such as adequate parking and lighting, all of which were not required criteria of the ordinance but were factors to be considered for a site plan. Plaintiffs' planning expert viewed the uses in the downtown business district located in the HD–C zone as of no moment in evaluating whether the present application was in compliance with the ordinance. The expert admitted, under cross-examination, that the township planners likely noted the existing uses and endeavored to provide for their continuation as permitted uses when creating the HD–C zone in the 1979 ordinance. However, he said that the residential uses would all be non-conforming. He insisted that the uses in the central business district, which were developed prior to the ordinance, or even after the ordinance would "have no bearing on this application whatsoever."

He believed that Rizas' application had to be assessed under current regulations and in the context of the immediately surrounding area.  He found irrelevant to Rizas' application "[w]hat is occurring elsewhere in the HDC Zone location 12 or 15 blocks away."

The Wyzykowskis testified concerning housing and traffic patterns in the neighborhood and produced 225 letters in opposition to the project.  Two members of the Board who spoke against the application wanted to have the property developed for residential uses, although residential structures are not permitted principal uses in this zone.

The municipal planner advised the Board that the projects met the use requirements of the zone, stating:

> Typically, a mixed use structure you have a commercial property downstairs and then two or three levels above it, the second floor, the third floor apartments above it.  The post office building is a typical example of that. * * * Technically, as the ordinance defines it this is a mixed use structure under the terms of the ordinance; therefore, it is a permitted use and this Board has jurisdiction over it.

The Board approved the application by a vote of three to two, out of nine regular members.  Three of the members (including Rizas) who could have participated disqualified themselves. The Mayor had appointed the three members who approved the application.  Plaintiffs then amended their prerogative-writ action.  They renewed their jurisdictional challenge and asserted various other claims, including the deficiency of notice concerning the revised application and conflict-of-interest issues that they had raised before the Board.  Specifically, they contested the participation by Board members appointed by the Mayor, and particularly objected to the participation of one building official.  Rizas had moved that the official be appointed to three positions, Building Inspector, Code Enforcement Supervisor and Construction Official, at a combined salary of $37,500.  The Mayor also cast the deciding vote in favor of the building official's appointment to the three positions.  The official's term on the Board was to have run from January 1, 1989, to December 31, 1989.  Plaintiffs also challenged the participation

of the professional staff of the Board. As a member of the Board, the Mayor had been involved in their hiring.

. The Law Division found no error in the proceedings except on the issue of defendant's right to bring the application to the Board. That court held that defendant was barred from presenting the application because he had been the Mayor at the time the application was filed, had appointed certain members of the Board, and had participated in the appointment of certain of its professional experts. The court concluded that although the record contained no evidence of actual impropriety by defendant or any of the Board members or its experts, the "perception of impropriety" precluded defendant from filing the application. Because defendant was no longer a member of the governing body, the court remanded the application to the Board for a new hearing.

On appeal, the Appellate Division essentially affirmed the judgment of the Law Division. It concluded that "[t]he highly discretionary nature of the many questions raised during the course of this application procedure, the rigorous contest of the issues at each level, and the pertinent legal authorities all counsel a new consideration of the issues, free from potential taint." 254 *N.J.Super.* at 39, 603 *A.*2d 53.

The court found "that the Mayor's role here as the developer-applicant on this controversial project, calling for close judgment by his political colleagues, is a situation much closer to counseling setting aside the Board's action as potentially tainted." *Id.* at 40, 603 *A.*2d 53. It emphasized that the Mayor had been under no compulsion to seize on and promote the development opportunities in his town during his term of office, which had ended only a few months after this approval had been formally granted in August. "He could have at least refrained and waited until his term expired to seek relief and approvals from this Board when he no longer was the Township's chief executive." *Id.* at 41, 603 *A.*2d 53. The panel held that a mayor "should not pursue planning and zoning approvals for

his own private development and commercial rental businesses while holding office without running the risk of judicial abrogation of those approvals as potentially tainted." *Id.* at 41–42, 603 *A.*2d 53. The court remanded the matter to the Board with the modification that the Board also reconsider the threshold jurisdictional issue of whether the applicant's proposal met the accessory-use standard in the local ordinance or required a use variance from the board of adjustment. We granted defendant's petition for certification, 130 *N.J.* 11, 611 *A.*2d 650 (1992).

## II

The substantive issue in the case is whether the proposed apartments could properly be considered "accessory" to the commercial use of the property. Because the issue might arise again following the remand of this matter contemplated by the Appellate Division, we invited the parties to submit supplemental briefs in order to resolve the question. In our discussion of the ordinance we use the present tense in referring to the provisions in the record before us. We have not sought to determine the current status of the ordinance. In a supplemental brief, plaintiffs inform us that the zoning ordinance has since been amended to put the subject property in a single-family zone.

Although courts defer to the expertise of municipal agencies in reviewing discretionary exercises of an agency's statutory powers, the interpretation of an ordinance is primarily a question of law. *See Urban v. Planning Bd.*, 238 *N.J.Super.* 105, 111, 569 *A.*2d 275 (App.Div.), *aff'd as modified*, 124 *N.J.* 651, 592 *A.*2d 240 (1990).

Zoning ordinances frequently permit uses that are accessory or incidental to an expressly permitted use. However, they often do not define those permitted accessory uses, and courts must determine whether the proposed accessory use is "customarily incidental" to the main activity. In *Charlie Brown of Chatham, Inc. v. Board of Adjustment*, 202 *N.J.Super.* 312,

495 *A*.2d 119 (1985), the Appellate Division reviewed the law defining "accessory" uses. Zoning ordinances that allow "customarily incidental" accessory uses to the main activity "permit, by implication, any use that logic and reason dictate are necessary or expected in conjunction with the principal use of the property. 6 *Powell, Law of Real Property*, (1979) ¶ 869[2][e]. The law is not difficult to recite but difficult to apply * * *." *Id.* at 323, 495 *A*.2d 119 (citation omitted).

The *Charlie Brown* court had to decide whether apartments for restaurant personnel would be incidental or accessory to the main permitted use of the property as a restaurant. Residential uses were not permitted in the zone where the restaurant was located. *Id.* at 318, 495 *A*.2d 119. The court viewed the term "incidental" in the definition of "accessory use" to incorporate two concepts. The use must be "subordinate and minor in significance" and must also bear a "reasonable relationship with the primary use." *Id.* at 324, 495 *A*.2d 119. "It is not enough that the use be subordinate; it must also be attendant or concomitant." *Ibid.* The court concluded that to house the plaintiff's key employees on the second floor over the restaurant was not reasonably related or incidental to the operation of a restaurant under present-day standards.

What distinguishes this case from *Charlie Brown* is that apartments *are* described as an accessory use to the primary commercial uses in the zone. The pattern of the Ocean Grove zoning ordinance is somewhat familiar. It includes a zone for single-family detached dwellings (the HD–1F Residential Zone); a zone for one, two, and three-family detached dwellings, including *existing* transient residential structures (the HD–Mixed Residential Zone); a zone for one, two, and three-family residences and *existing* rooming houses, hotels, and retail business establishments of a neighborhood type (the HD–Transient Residential Zone); and, finally, a zone whose primary uses are retail stores, museums, galleries, gift shops, personal-service establishments, such as barber shops and beauty parlors, fully-

enclosed eating establishments, banks, business and professional offices, laundromats, and coin-operated dry cleaning establishments (the HD–C zone).

The ordinance identifies uses allowed by right as principal and accessory. The principal uses of the HD–C zone are the variety of commercial uses including professional business offices, which were planned by Rizas. The accessory uses in the HD–C zone include "[a]partments in mixed use commercial/residential structures." In his original application, then, Rizas submitted plans for a structure that provided for one commercial office and eleven residential units.

As noted, Rizas demonstrated to the Board, through his exhibits, that virtually all of the structures in the downtown business area of Ocean Grove were three-story structures in which the first floor is devoted to various commercial uses, while the second and third floors were devoted to residential housing having no relationship to the commercial uses on the first floor. He argues that because Ocean Grove had not been the subject of a planning ordinance until 1979, for the planning board to infer that the intention of the ordinance was to recognize as permitted uses those uses then in existence in the fully-developed downtown business area was reasonable.

The linchpin of Rizas' argument is that by implication drawn from the history of Ocean Grove the "accessory use is allowed by right." The difficulty with the argument is that the ordinance itself requires the application of the principles of *Charlie Brown*. For in analyzing the relationship between a professional office as accessory to a residence, our courts have asked whether the interpretation is consistent with both "the *letter* and the underlying *philosophy* of the ordinance." *Keller v. Town of Westfield*, 39 *N.J.Super.* 430, 435, 121 *A.*2d 419 (App.Div.1956) (emphases added). The Ocean Grove ordinance defines "accessory use" in the same terms the *Charlie Brown* court employed: "A use customarily incidental and subordinate

to the main use conducted on a lot whether such accessory use be conducted in the main building or accessory building."

As noted, no effort has been made to demonstrate compliance with this definition. The offices on the first floor and the apartments on the second and third floors bear no relationship to one another. The planning consultant to the Board refused to state whether the apartments or the offices constituted the principal or accessory use.

To test the question whether a relationship between principal and accessory uses should be required, we might reverse the uses and consider how we would analyze the issue if the principal uses in the zone were residential and the commercial offices were listed as the accessory in "mixed use residential/commercial structures." We can well assume that the affected community would feel the same sense of misinterpretation if a structure were proposed to be 90% accessory use (for example, offices) and 10% principal use (for example, residential apartments), as this structure originally was proposed approximately 90% accessory and 10% principal use.

The governing body clearly has the power to provide mixed-use commercial and residential structures as a primary use in the HD–C zone. If that is the community's intent, the ordinance has not fulfilled it. The ordinance is somewhat unusual in that it did make an attempt at grandfathering some prior patterns of use. The HD–Mixed and HD–Transient residential zones allow as principal uses *"existing* rooming houses and hotels," and *"existing* transient residential structures." (Emphases supplied.) In addition, apartments are allowed as *conditional* uses in those zones, subject to density and other requirements. Apartments are not listed as a conditional use in the HD–C or HD–1F residential zones. Hence, we may assume that the drafters well knew how to deal with specific patterns of existing uses. Whatever its philosophy, the ordinance did not identify mixed commercial/residential development as a principal use in the HD–C zone.

## III

Although Rizas no longer serves as mayor of the community, we believe that the issue of his status is important and recurring and requires our review. We believe that the principle of decision articulated by the courts below may have been too broadly stated insofar as it might bar any municipal mayor or appointing authority from the conduct of any business or transaction that might require local licensure or permitting.

The Municipal Land Use Law, *N.J.S.A.* 40:55D–1 to –129, provides that any interested party may obtain review of a final decision of a planning board or board of adjustment by any court of competent jurisdiction, according to law. *N.J.S.A.* 40:55D–17.h. The general nature of that review is to determine "whether the board below followed the statutory guidelines and properly exercised its discretion." William M. Cox, *New Jersey Zoning and Land Use Administration* 470 (1993) (hereinafter Cox, *New Jersey Zoning*) (citing *Burbridge v. Mine Hill Township*, 117 *N.J.* 376, 568 *A.*2d 527 (1990)).

■ The jurisdiction that we exercise with respect to the status and involvement of the appointees of the mayor or the role of the mayor himself derives from a source other than the Municipal Land Use Law. Our judicial system is historically vested with a comprehensive prerogative-writ jurisdiction, which it inherited from the King's Bench. We have frequently exercised that jurisdiction in the supervision of governmental tribunals, including administrative agencies. *Avant v. Clifford*, 67 *N.J.* 496, 520, 341 *A.*2d 629 (1975). That common-law jurisdiction is guaranteed under *N.J. Constitution* article VI, section 5, paragraph 4. The oft-cited function of the common-law writ of *certiorari* is "to bring before the superior court for inspection the record of the proceedings of the inferior tribunal, to determine whether the latter had jurisdiction and had proceeded according to law." *State v. Court of Common Pleas*, 1 *N.J.* 14, 19, 61 *A.*2d 503 (1948). Among the guarantees of the common law is the entitlement to a fair and impartial tribunal.

These obligations are not mere theoretical concepts or idealistic abstractions of no practical force and effect; they are obligations imposed by the common law on public officers and assumed by them as a matter of law upon their entering public office. The enforcement of these obligations is essential to the soundness and efficiency of our government, which exists for the benefit of the people who are its sovereign.

[*Driscoll v. Burlington–Bristol Bridge Co.*, 8 *N.J.* 433, 476, 86 *A*.2d 201, *cert. denied*, 344 *U.S.* 838, 73 *S.Ct.* 25, 97 *L.Ed.* 652 (1952).]

Thus, common-law principles concerning the participation of public officials in matters in which they have a personal interest primarily govern this dispute. At common law "[a] public official is disqualified from participating in judicial or quasi-judicial proceedings in which the official has a conflicting interest that may interfere with the impartial performance of his duties as a member of the public body." *Scotch Plains–Fanwood Bd. of Educ. v. Syvertsen*, 251 *N.J.Super.* 566, 568, 598 *A*.2d 1232 (App.Div.1991). The Municipal Land Use Law codified the common-law principles, expressly prohibiting a planning board member from acting "on any matter in which [the member] has, either directly or indirectly, any personal or financial interest." *N.J.S.A.* 40:55D–23.b.

■ We repeat the general guidelines for determining whether a particular interest is sufficient to disqualify. "The decision as to whether a particular interest is sufficient to disqualify is necessarily a factual one and depends upon the circumstances of the particular case." *Van Itallie v. Franklin Lakes*, 28 *N.J.* 258, 268, 146 *A*.2d 111 (1958) (citing *Aldom v. Borough of Roseland*, 42 *N.J.Super.* 495, 503, 127 *A*.2d 190 (App.Div.1956)). "The question will always be whether the circumstances could reasonably be interpreted to show that they had the likely capacity to tempt the official to depart from his sworn public duty." *Van Itallie, supra,* 28 *N.J.* at 268, 146 *A*.2d 111.

Local governments would be seriously handicapped if every possible interest, no matter how remote and speculative, would serve as a disqualification of an official. If this were so, it would discourage capable men and women from holding public office. Of course, courts should scrutinize the circumstances with great care and should condemn anything which indicates the likelihood of corruption or favoritism. But in doing so they must also be mindful that to

abrogate a municipal action at the suggestion that some remote and nebulous interest is present, would be to unjustifiably deprive a municipality in many important instances of the services of its duly elected or appointed officials. The determinations of municipal officials should not be approached with a general feeling of suspicion, for as Justice Holmes has said, "Universal distrust creates universal incompetency." *Graham v. United States*, 231 *U.S.* 474, 480, 34 *S.Ct.* 148, 151, 58 *L.Ed.* 319, 324 (1913); see also *Ward v. Scott* (II), 16 *N.J.* 16 [105 *A.*2d 851] (1954).

[*Id.* 28 *N.J.* at 269, 146 *A.*2d 111.]

Actual proof of dishonesty need not be shown. *Aldom, supra,* 42 *N.J.Super.* at 503, 127 *A.*2d 190. An actual conflict of interest is not the decisive factor, nor is "whether the public servant succumbs to the temptation," but rather whether there is a potential for conflict. *Griggs v. Borough of Princeton,* 33 *N.J.* 207, 219, 162 *A.*2d 862 (1960) (citing *Aldom, supra,* 42 *N.J.Super.* at 502, 127 *A.*2d 190). A conflicting interest arises when the public official has an interest not shared in common with the other members of the public. *Id.* 33 *N.J.* at 220–21, 162 *A.*2d 862. Another way of analyzing the issue is to understand that "[t]here cannot be a conflict of interest where there do not exist, realistically, contradictory desires tugging the official in opposite directions." *LaRue v. Township of East Brunswick,* 68 *N.J.Super.* 435, 448, 172 *A.*2d 691 (App.Div. 1961).

Our courts have invoked the application of the test under varied circumstances. See *Griggs, supra,* 33 *N.J.* 207, 162 *A.*2d 862 (invalidating determination of "blighted" area by borough council where two participating councilmen were professors of university benefitted by designation); *Pyatt v. Mayor of Dunellen,* 9 *N.J.* 548, 89 *A.*2d 1 (1952) (voiding vote for ordinance where councilmen were employees of corporation that substantially benefitted); *Barrett v. Union Township Comm.,* 230 *N.J.Super.* 195, 553 *A.*2d 62 (App.Div.1989) (voiding vote where councilman's mother resided in nursing home favored by zoning amendment); *Sokolinski v. Woodbridge Township Mun. Council,* 192 *N.J.Super.* 101, 469 *A.*2d 96 (App.Div.1983) (enjoining vote of board of adjustment members employed by or related to

employees of board of education who benefitted by variance); *Marlboro Manor, Inc. v. Board of Comm'rs*, 187 *N.J.Super.* 359, 454 *A.*2d 905 (App.Div.1982) (voiding vote where councilmen were members of church opposed to transfer of liquor license); *S & L Assocs., Inc. v. Township of Washington*, 61 *N.J.Super.* 312, 160 *A.*2d 635 (App.Div.1960) (invalidating zoning amendment enhancing value of property owned by certain voting members of governing body), *aff'd in part, rev'd in part*, 35 *N.J.* 224, 172 *A.*2d 657 (1961); *Aldom, supra*, 42 *N.J.Super.* 495, 127 *A.*2d 190 (voiding zoning ordinance where employer of councilman who voted for enactment would be benefitted); *Hochberg v. Borough·of Freehold*, 40 *N.J.Super.* 276, 123 *A.*2d 46 (App.Div.) (voiding zoning amendment permitting enlargement of horse track at which participating councilman operated horsemen's kitchen), *certif. denied*, 22 *N.J.* 223, 125 *A.*2d 235 (1956); *Bracey v. City of Long Branch*, 73 *N.J.Super.* 91, 179 *A.*2d 63 (Law Div.1962) (voiding ordinance where architect-member of planning board stood to gain by urban renewal ordinance benefitting his client-agency). *But see Van Itallie, supra*, 28 *N.J.* 258, 146 *A.*2d 111 (upholding zoning amendment although participating councilman's brother held a "lower echelon" position in benefitted corporation).

A commentator has distilled those varying circumstances into four types of situations that require disqualification: (1) "Direct pecuniary interests," when an official votes on a matter benefitting the official's own property or affording a direct financial gain; (2) "Indirect pecuniary interests," when an official votes on a matter that financially benefits one closely tied to the official, such as an employer, or family member; (3) "Direct personal interest," when an official votes on a matter that benefits a blood relative or close friend in a non-financial way, but a matter of great importance, as in the case of a councilman's mother being in the nursing home subject to the zoning issue; and (4) "Indirect Personal Interest," when an official votes on a matter in which an individual's judgment may be affected because of membership in some organization

and a desire to help that organization further its policies. See Michael A. Pane, *Conflict of Interest: Sometimes a Confusing Maze, Part II*, New Jersey Municipalities, March 1980, at 8, 9.

■■ The status of planning board members appointed by the mayor does not fit within any of those categories. Neither of the courts below perceived that the fact of the Mayor's appointment of the Board members in and of itself created a conflict of interest on their part in the outcome of the proceedings. Rather, those courts perceived an appearance of impropriety that existed while the Mayor was seated in office. Both courts believed that in a remand proceeding the Board members would not be tainted by virtue of their appointments. Although the courts below did not invalidate the approvals because the building official participated, we find that he should have been disqualified. As noted, he held salaried positions achieved by the Mayor's appointment or with the Mayor's involvement. He may be seen as one in Pane's second category, *supra* (voting on a matter that benefits an employer) in that the Mayor was an agent of the employer that brought about the hiring. Of course, the mayor of a community will almost always be involved in the initial appointment of one in the building official's position. (Under *N.J.S.A.* 52:27D–126.b. a Construction Official, one of the positions held by this official, may obtain tenure of office from such an appointment.) Although we may agree that the law would not contemplate the disqualification of a building official in every circumstance, as, for example, if a mayor were putting an addition on his home or redoing a business office, in this case the official was acting in a quasi-judicial capacity. It asks too much of the official that he deny that "realistically, contradictory desires tug[ ] the official in opposite directions." *LaRue, supra,* 68 *N.J.Super.* at 448, 172 *A.*2d 691. Because the members of the professional staff of the Board do not act in the same quasi-judicial capacity, we do not think that they are disqualified.

■ The remaining issue, undoubtedly of great concern to the public, is the appearance of the Mayor before the Board on an application of this nature. The issue is disturbing because of the intuitive concern that citizens in the community may fear a betrayal of the public trust. Is there a principle of law that disqualifies the public official from the regular pursuits of business in his or her community? For although this application is controversial, a wide variety of circumstances exists in which a mayor will need to submit his or her personal affairs to the jurisdiction of community boards. Some examples would be: if the public official needs to sell farm acreage to send a child to college and needs a subdivision; another might need site plan approval to expand a fish-processing plant; another owning a restaurant in the community might need to transfer the liquor license from place to place. The nearness of the expiration of the official's term will not offer a principle for decision in most such circumstances. (The basic term of a mayor's office is four years, unless otherwise provided by law. *N.J.S.A.* 40A:9–130.) Some mayors have served their communities for as long as forty years.

We tend to think of the issues in this case in terms of the big-city mayors who derive their income from holding office. In reality, most New Jersey communities are not governed by professional politicians but by citizens of other callings who devote only part of their lives to the service of their communities. For the most part, we believe our five hundred or more communities have part-time mayors. Many serve with no compensation whatsoever. One who engages in such activity is not thereby deprived of the ordinary rights of citizenship.

*Place v. Board of Adjustment,* 42 *N.J.* 324, 200 *A.*2d 601 (1964), will not control every circumstance. That case concerned a mayor whose appearance as private counsel to an adjoining property owner in a variance dispute before the municipal board of adjustment could be seen as "influence peddling." In accepting the retainer of the private client, he "voluntarily created a pecuniary personal interest which con-

flicted with the fiduciary duty he owed to all members of the public." *Id.* at 332–33, 200 *A.*2d 601. Public officials who are required by law to submit their private affairs to the jurisdiction of the body that they serve do not thereby traduce their fiduciary relationship in the same way as ones who sell their services to others. For example, a member of a freeholder board owning property on a county road might need approval of the county planning board to make changes at the site. For that official to submit site plans to the planning board would not constitute a breach of fiduciary duty but a necessary obligation attendant to the private status of the official. So too here the Mayor cannot be disqualified from submitting to the jurisdiction of the Board, as all other citizens of the community are required to do. What is troubling in this case to us, and our concurring and dissenting members, is the discretionary nature of the exercise of jurisdiction, not the jurisdiction itself. Unlike a mayor who is just making a change in an existing business property, such as the addition of an office or a relocation of parking spaces, a mayor who initiates a project like Rizas' may be perceived, like the mayor in *Place*, as having "voluntarily created a pecuniary personal interest which conflicted with the fiduciary duty he owed to all members of the public." *Ibid.*

Although we find inapplicable the doctrine of necessity for purposes of constituting a quorum when "the body is unable to act without the members in conflict taking part," *Allen v. Toms River Regional Bd. of Educ.*, 233 *N.J.Super.* 642, 651, 559 *A.*2d 883 (Law Div.1989), we note that the problems that arose in this case are more easily resolved now than they would have been before. The Municipal Land Use Law currently permits appointment of additional members to adjustment and planning boards "until there are the minimum number of members necessary to constitute a quorum" otherwise lacking because of disqualification of members due to conflicts of interest. *See N.J.S.A.* 40:55D–69.1; *N.J.S.A.* 40:55D–23.2. In Rizas' case, two members, besides himself, did disqualify themselves.

Of course, for a person in public office to appear to seek to take advantage of the office will invariably be the worst politics. The public will rightly cease to support those who appear to pursue their private interests at the expense of the public good. In this case the public skepticism and disillusionment were heightened by the timing and nature of the application, involving, as it did, the close questions of interpretation of the ordinance as well as the acquisition of land that had once belonged to the local water utility.

The common-law doctrines that attend the office of the local public official will be influenced by the recent enactment in 1991 of the Local Government Ethics Law, *N.J.S.A.* 40A:9–22.1 to –22.25 ("the Ethics Law"). The Ethics Law requires all local government officers, including those such as the Mayor, members of planning boards, zoning boards of adjustment, governing bodies, and others, to file a financial statement annually in the municipality or county in which they serve and with the Local Finance Board in the Division of Local Government Services in the Department of Community Affairs. *N.J.S.A.* 40A:9–22.6. That statement must include disclosure of every source of (1) income exceeding $2,000, (2) fees and honoraria exceeding $250 from any one source, and (3) gifts exceeding $400 from any one source that the officer or a member of his or her immediate family receives. *N.J.S.A.* 40A:9–22.6.(1)–(3). The Ethics Law has refined the definition of conflict of interest and provides that

> [n]o local government officer or employee shall act in his official capacity in any matter where he, a member of his immediate family, or a business organization in which he has an interest, has a direct or indirect financial or personal involvement that might reasonably be expected to impair his objectivity or independence of judgment[.]

[*N.J.S.A.* 40A:9–22.5.d.]

Cox interprets the use of the word "involvement" instead of "interest" to broaden the areas of disqualification to include perhaps even personal friendships. Cox, *New Jersey Zoning, supra*, at 30. He anticipates "a large number of appeals to the

local ethics boards authorized to be established by municipalities and counties as well as an increased volume of litigation with respect to conflict issues until the courts have construed the meaning of the statute." *Ibid.*

The Ethics Law does state, however: "Nothing [herein] shall prohibit any local government officer or employee, or members of his immediate family, from representing himself, or themselves, in negotiations or proceedings concerning his, or their, own interests." *N.J.S.A.* 40A:9–22.5.k. Under the Municipal Land Use Law the mayor appoints almost all planning board members. *N.J.S.A.* 40:55D–23. To rule categorically that mayors are disqualified from appearing before boards composed at least in part of their appointees would appear to produce an inconsistency in the provisions of the Municipal Land Use Law and the Ethics Law. The Assembly State Government Committee Statement accompanying the Ethics Law makes clear that local governing bodies have the authority to adopt higher standards of ethics for local officials. By the same token, officials who act under *N.J.S.A.* 40A:9–22.5.k to represent their own interests should not be automatically viewed as attempting to use their official positions to obtain "unwarranted privileges or advantages" forbidden by *N.J.S.A.* 40A:9–22.5.c. Quite possibly—although we need not decide the point—a local governing body could require its officials to forego the statutory right to the pursuit of their own interests before local bodies.

IV

To sum up, courts review the actions of local government to ensure that their proceedings have been in accordance with law or constitutional mandate. This case arose before the Legislature enacted the Ethics Law. Future decisions should be consistent with the principles of that Act. The Legislature has for the first time created a comprehensive code of ethics for local government. For example, the Ethics Law specifically proscribes the kind of representation that this Court had de-

clared invalid in *Place v. Board of Adjustment, supra,* 42 *N.J.* 324, 200 *A.*2d 601: *N.J.S.A.* 40A:9–22.5.h. bars a local government officer from representing "any person or party other than the local government" in connection with any matter pending before an agency in the local government in which the official serves. At the same time, the Ethics Law does not prohibit "any local government officer or employee, or members of his immediate family, from representing himself, or themselves, in negotiations or proceedings concerning his, or their, own interests." *N.J.S.A.* 40A:9–22.5.k. Rizas' case involves a particularly troubling exercise of that representation because a reasonably-informed citizen could see him as seeking a favor or special treatment. However, many cases will arise in which a part-time elected official will have to appear before a local government agency regarding his or her own interest that may be less discretionary but no less controversial. Hence, the holding below that a mayor may not "pursue planning and zoning approvals for his own private development and commercial rental businesses," *Rizas, supra,* 254 *N.J.Super.* at 41–42, 603 *A.*2d 53, without possible invalidation may go too far, given the provisions of the Ethics Law.

Whether the Legislature should have proscribed all such activity is a close policy question. It appears not to have done so. The Legislature has declared the public policy of this State:

b. The vitality and stability of representative democracy depend upon the public's confidence in the integrity of its elected and appointed representatives;

c. Whenever the public perceives a conflict between the private interests and the public duties of a government officer or employee, that confidence is imperiled;

\*       \*       \*       \*       \*       \*       \*       \*

e. It is the purpose of [the Ethics Law] to provide a method of assuring that standards of ethical conduct and financial disclosure requirements for local government officers and employees shall be *clear, consistent, uniform in their application, and enforceable on a statewide basis,* and to provide local officers or employees with advice and information concerning possible conflicts of interest which might arise in the conduct of their public duties.

[*N.J.S.A.* 40A:9–22.2 (emphasis added).]

The "appearance of impropriety" standard suggested by our concurring and dissenting members, *post* at 534, 626 *A.*2d at 418, is one that we have generally applied to regulate the conduct of lawyers, particularly lawyers in public employment. *See In re Opinion 452*, 87 *N.J.* 45, 50, 432 *A.*2d 829 (1981); *Perillo v. Advisory Comm.*, 83 *N.J.* 366, 373, 416 *A.*2d 801 (1980); *In re Opinion No. 415*, 81 *N.J.* 318, 324, 407 *A.*2d 1197 (1979). We there act not in the exercise of our limited prerogative-writ power but in the exercise of our plenary power to regulate lawyers. The Legislature has plenary power to regulate local officials. That body has not yet declared categorically that citizens serving as public officials may not continue to engage in their private affairs in their communities. What limits or restraints it might intend or impose are not clear. Our colleagues suggest that because Rizas' was a "lucrative business venture," *post* at 536, 626 *A.*2d at 419, he would be obliged to refrain from engaging in such private affairs so long as he were mayor. The sad fact of life is that no one is ever certain that a business venture will be lucrative. Nothing in the record establishes that Rizas' venture was any less uncertain than those of countless small businessmen and women who serve our communities. Hence, we will have to seek a principle of decision that has consistent application. The Legislature could have enacted, but did not, a provision that a local government officer could represent his or her own interests so long as the matter did not become controversial. See *N.J.S.A.* 40A:9–22.2. The Ethics Law represents the Legislature's most recent efforts to balance the respective interests of the public and its officeholders throughout the state's 500 or more municipalities. As the thoughtful opinion of our concurring and dissenting members suggests, the statute's applications will raise close questions of public policy. It may be that the Legislature will provide more definitive resolution of the issues.

For now, the Legislature has reaffirmed that "[p]ublic office and employment are a public trust." *N.J.S.A.* 40A:9–22.2.a. Given the very substantial reporting requirements under the

Ethics Law, see *supra* at 529, 626 *A*.2d at 416, an informed public will be able to evaluate whether the conduct of any public official exceeds the bounds of the public trust. The disclosure provisions of the law will enable the public to decide whether the official shall continue to represent them.

A commentator has noted:

The law allows the citizens in the municipality to better identify with those who have been elected or appointed to serve them. The Ethics Law rightfully forces public officials to act with integrity. The Ethics Law is helpful to public officials since it delineates what they are permitted and not permitted to do. * * * The disclosure portion of the Ethics Law reveals any conflicts and examines the official's ability to perform public duties. The public will be aware of for whom the official works and any connections, whether permissible or not under the Ethics Law, that exist.

[Debra S. Weisberg, *Eliminating Corruption in Local Government: The Local Government Ethics Law*, 17 *Seton Hall Leg.J.* 303, 322–24 (1993) (footnotes omitted).]

We are satisfied that in the future, the provisions of *N.J.S.A.* 40:55D–23.2 and 40:55D–69.1, which permit the temporary assignment of planning and adjustment board members to boards lacking quorums due to conflicts of interest, as well as the provisions of the Ethics Law, which permit municipalities to establish local ethics boards, will diminish the possibility that controversies such as the one surrounding this application will recur.

The judgment of the Appellate Division is affirmed insofar as it invalidates the development approvals. The judgment is modified insofar as it would remand the matter to the Board for a new application. Any further proceedings in the matter would have to be before the zoning board of adjustment. Absent an amendment of the ordinance to state that residential apartments are a permitted principal use allowed by right in the zone, an application under the ordinance before us would have to be to the zoning board of adjustment.

CLIFFORD, J., dissenting in part.

If the circumstances of this case do not present an appearance of impropriety on the part of both the Mayor and the Planning Board members, nothing does.

Defendant Rizas became Mayor of Neptune Township on January 3, 1988, having been elected to that position by the members of the Township Committee. By virtue of his office Rizas was himself a member of the Planning Board. See *N.J.S.A.* 40:55D–23(a). The Board consists of nine members plus two alternates.

On the day he assumed the Mayor's office for his first term Rizas appointed Eamon Jones to the Planning Board for a four-year term. At the Committee's annual organizational meeting on January 1, 1989, the Committee Members again elected Rizas as Mayor. Thereupon the Committee appointed Daryl Daniels as a Class III member of the Planning Board for a one-year term, and the Mayor appointed Gene Marks to a one-year term. Mr. Marks was the Class II member, that is, an official of the municipality: building inspector, code-enforcement supervisor, and construction official, with a salary of $37,500. He had been appointed to those positions in September 1988 by resolution of the Township Committee, introduced by Mayor Rizas. On January 1, 1989, the Mayor appointed Paul Roberts to the Planning Board for a four-year term, and George Basket and Joe Sears as alternates with two-year terms.

Mayor Rizas was also an owner and developer of commercial property. During his 1988 term as Mayor he had contracted to purchase an undeveloped lot in Ocean Grove, a part of Neptune Township. The property was one of the very few lots in Ocean Grove that had remained undeveloped, and it was the only undeveloped lot in the Historic District—Commercial zone.

Wishing to develop the property, Rizas, in March 1989, some nine months before his term as Mayor was to end, filed an application for site-plan approval with the Planning Board—the same Board of which he was a member and to which he had appointed three members and two alternates, as recited above. The application, which met with strenuous opposition from members of the public (the Planning Board received 225 letters in opposition to it), took the rocky procedural course described

in detail by the Appellate Division, see *Wyzykowski v. Rizas*, 254 *N.J.Super.* 28, 31–35, 603 *A.*2d 53 (1992), before the Planning Board finally approved it by a vote of three to two. Some members did not vote on the Mayor's application, and others disqualified themselves. The three who voted in favor—Chairman Jones, Mr. Marks, and Mr. Basket—were all Rizas appointees. Mr. Sears, appointed by Rizas, and Peter Stagg, a holdover member from a prior administration, were recorded as opposed.

While the Mayor's application was making its way through the Planning Board, the objectors, plaintiffs here, filed this action in lieu of prerogative writs. After the Planning Board had acted, the trial court, emphasizing that it was "not impugning the integrity of the members of the planning board," determined that the application should proceed anew before that Board because of a "[p]ublic perception * * * that the mayor [had] influenced members of the Board"—a perception of impropriety. *See Griggs v. Princeton*, 33 *N.J.* 207, 219–22, 162 *A.*2d 862 (1960). The Appellate Division agreed, in a carefully-circumscribed opinion by Judge King with which I am in substantial accord. Notably, the court below said:

> We do not suggest that the Mayor or any member of the Board is automatically disqualified from making any application for relief, for instance, for a dimensional variance to their homes for a modest addition or an acknowledged accessory use. Certainly, if such necessity compels an application then all appointees of the Mayor on the Board, and all advisors to the Board in whose appointments the Mayor participated, should stand aside. We do hold that the Mayor should not pursue planning and zoning approvals for his own private development and commercial rental businesses while holding office without running the risk of judicial abrogation of those approvals as potentially tainted.
>
> [254 *N.J.Super.* at 41–42, 603 *A.*2d 53 (footnote omitted).]

I see the stated holding not simply as consistent with our well-established case law but as compelled by that law. In *Place v. Board of Adjustment*, 42 *N.J.* 324, 200 *A.*2d 601 (1964), on which the Appellate Division relied, this Court found that a mayor's representation of a private citizen before a board comprised of persons appointed by the mayor "create[d] doubt in the public mind as to the impartiality of the board's action."

*Id.* at 333, 200 *A.*2d 601. If a mayor's representation of another creates that tension, *a fortiori* the public perception of a mayor appearing before such a board in connection with his own lucrative business venture should trigger even greater suspicion regarding the legitimacy of the board's action. *See also Aldom v. Borough of Roseland,* 42 *N.J.Super.* 495, 500–01, 127 *A.*2d 190 (App.Div.1956) ("A public office is a public trust. Borough councilmen, as fiduciaries and trustees of the public interest, must serve that interest with the highest fidelity. The law tolerates no mingling of self interest; it demands exclusive loyalty.").

The majority concludes—and I agree—that the Municipal Land Use Law intended to carry forward the common-law standards concerning conflicts of interests announced in this Court's earlier determinations. See *ante* at 523, 626 *A.*2d at 413 ("Thus, common-law principles concerning the participation of public officials in matters in which they have a personal interest primarily govern this dispute."). However, the majority also views its result as consistent with the Local Government Ethics Law (the Ethics Law), *N.J.S.A.* 40A:9–22.1 to –22.25. Surely it is not.

The Legislature enacted that Law in 1991 to codify a set of guidelines designed to limit actions by local officials that might create doubt in the minds of citizens concerning the motivations of those officials. *N.J.S.A.* 40A:9–22.5(d) provides that

[n]o local government officer or employee shall act in his official capacity in any matter where he, or a member of his immediate family * * * has a direct or indirect financial or personal involvement that might reasonably be expected to impair his objectivity or independence of judgment.

As the majority notes, at least one respected commentator has suggested that the Ethics Law intends an even broader category of disqualifying interests than this Court has pronounced previously. *Ante* at 530, 626 *A.*2d at 416; see William M. Cox, *New Jersey Zoning and Land Use Administration* 30 (1992). Certainly, the Ethics Law contains no suggestion that the Legislature sought to slacken the ethical standards that apply

to actions by local-government officials. As I understand that Law, the same factors that guided our resolution of earlier cases would apply in the instant action as well.

The majority offers a number of formulations of the common-law rule: "the official has a conflicting interest that may interfere with the impartial performance of his duties as a member of the public body," *ante* at 523, 626 *A.*2d at 413; "the circumstances could reasonably be interpreted to show that they had the likely capacity to tempt the official to depart from his sworn public duty," *ante* at 523, 626 *A.*2d at 413; "there is a potential for conflict," *ante* at 524, 626 *A.*2d at 413; "the public official has an interest not shared in common with the other members of the public," *ante* at 524, 626 *A.*2d at 413; or "contradictory desires tug[ ] the official in opposite directions," *ante* at 524, 626 *A.*2d at 413. Under *any* of those propositions the members appointed by Rizas could not vote on his proposal.

Recognizing the important justification for restraints on the actions of local officials in the face of an apparent conflict, the majority notes that "for a person in public office to appear to seek to take advantage of the office will invariably be the worst politics." *Ante* at 529, 626 *A.*2d at 416. It characterizes as "profoundly disturbing" the issue of the Mayor's appearance before the Board. At least 225 persons were so upset by the Mayor's application that they put pen to paper to acquaint the Board with their concerns. The two courts below were "disturbed" enough to order rehearing on Rizas's application. If an application stirs such considerable concern among such large numbers of presumptively reasonably-minded persons, the application involves a "potential for conflict" sufficient to require that the interested members of the Board refrain from voting on it. The troubling feature of this case is not the Mayor's appearance before the Board but the Mayor's appearance before a Board four of whose five voting members he had appointed.

The Court limits its concern to Mr. Marks, who had benefited from Mayor Rizas's introduction of a resolution appointing him to positions paying a total of $37,500 per year. The majority agrees that Marks should have refrained from action on the application. Along with the Court I am willing to assume that Marks acted impartially and that he meticulously considered Mayor Rizas's application. Indeed, no evidence suggests that Marks acted otherwise. Nevertheless, nothing Marks could have done short of disqualifying himself from consideration of the application could have prevented a reasonably-minded citizen from wondering if Marks's affirmative vote on the application was a "payoff" for Rizas's sponsorship of Marks for his salaried position with the Township. Whether Marks departed from his sworn duty matters not, because the circumstances were fraught with the temptation to forsake that duty—or so one might reasonably conclude.

The majority's reliance on *N.J.S.A.* 40A:9–22.5(k), which says that "[n]othing shall prohibit any local government officer or employee, or members of his immediate family, from representing himself, or themselves, in negotiations or proceedings concerning his, or their, own interests," is misplaced. This case involves a more vital ethical question not addressed by that section, namely, whether a local official may appear before a local board *and before persons appointed to that board by the applying official.* If this case involved a similar site-plan application by a member of the Neptune Township Shade Tree Commission, I would have no hesitation in concluding that that person could appear before the Board without violating the Municipal Land Use Law or the Ethics Law; but our case differs significantly, and our concern should not be limited solely to the problem of the one Board member, Marks, whom the applicant had recommended for salaried employment in the municipality.

In focusing on *N.J.S.A.* 40A:9–22.5(k), the majority zooms in too closely and misses the big picture. The trouble lies not in Rizas's position as a local official, but in his status as appoint-

ing authority for the three members who voted in favor of his application. The conclusion that Mayor Rizas's appointees should not have considered his application is not at all inconsistent with *N.J.S.A.* 40A:9–22.5(k).

In support of its judgment the majority also relies on the need for clear and uniform application of the Ethics Law. *Ante* at 531, 626 *A.*2d at 417. To hold that a person who has been appointed to a planning board by a mayor-applicant should not participate in the consideration of the mayor's commercial-development site-plan application strikes me as being as certain as—and more rational than—the rule announced by the Court.

In the end, we must return to the intent of conflict-of-interest laws—to maintain public confidence in government—and to the values that guided our determination of earlier, similar cases. The goal of maintaining public confidence is ill-served by a determination that a mayor may gain the benefit of a controversial decision in his favor when the only votes in the mayor's favor are cast by his own appointees. The circumstances present a prototypical eventuality for participation by members of a board of adjustment in the consideration of an application. See *N.J.S.A.* 40:55D–23.2 (permitting members of board of adjustment to serve on planning board when conflicts of interest reduce to less than a quorum the number of planning-board members eligible to act).

*N.J.S.A.* 40:55D–23.2 will allow a mayor to bring a similar application without the same potential for taint as this case presents. Therefore, a mayor will not be "disqualifie[d] [from] * * * the regular pursuits of business in his or her community." *Ante* at 528, 626 *A.*2d at 415. Although the Legislature approved *N.J.S.A.* 40:55D–23.2 after Rizas had submitted his application and the Board had acted, that section undoubtedly lessens the burdens on a mayor who might wish to pursue a similar application. See *ante* at 528–529, 626 *A.*2d at 415–416.

Our late Governor and Chief Justice Richard J. Hughes understood the need for public confidence in government. In three consecutive state-of-the-State addresses, he emphasized that theme. Noting with pride that in 1967 he had signed a bill that strengthened the state's conflict-of-interest laws, he termed that act "no more than a meaningful first step." *Fitzgerald's Legislative Manual* 798, 838 (J. Joseph Gribbins, ed., 1969). The majority's conclusion that a mayor might appear before a planning board on which he served and whose membership included several persons whom that mayor had appointed, and one member that the mayor had recommended for salaried municipal employment, represents a major detour from the path to public confidence. As Governor Hughes said, "It is the public's legitimate expectation that those elected or selected to do the work of government will do so with only a single thought—the public." *Ibid.*

I therefore dissent from so much of the Court's judgment today as validates the consideration of citizen Rizas's application by Mayor Rizas's appointees.

*For modification and affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

Justices CLIFFORD, HANDLER and POLLOCK concur in part and dissent in part—3.