925 A.2d 750 (2006)
394 N.J. Super. 207
Joseph and Pamela HUGHES, et. als., Plaintiffs,
v.
MONMOUTH UNIVERSITY and West Long Branch Board of Adjustment, Defendants.
Borough of West Long Branch, Plaintiffs,
v.
Zoning Board of Adjustment of the Borough of West Long Branch; and Monmouth University, Defendants.
Superior Court of New Jersey, Law Division, Monmouth County.
Decided October 24, 2006.
Approved for Publication June 27, 2007.
*752 James M. Siciliano, Long Branch, for plaintiffs Joseph and Pamela Hughes.
Gregory S. Baxter, Jersey City, for plaintiff Borough of West Long Branch (Caruso & Baxter, attorneys).
Dean A. Gaver, Woodbridge, for defendant Monmouth University (Greenbaum, Rowe, Smith & Davis, attorneys; Steven Firkser and Michelle M. Sekowski, on the brief).
Thomas H. Klein, Murray Hill, for defendant Zoning Board of Adjustment of the Borough of West Long Branch (Smith and Klein, attorneys).
LEHRER, P.J.Ch.

STATEMENT OF FACTS
This action is an appeal of the approval by the Zoning Board of Adjustment of the Borough of West Long Branch (the "Board") of an Application by Monmouth University ("University") to build a 196-bed dormitory residence hall with parking for 126 vehicles; six tennis courts with public restrooms and a 20-space parking lot; and a storm water management basin.
In its Application, the University obtained relief from thirteen requirements of the Borough of West Long Zoning Ordinance. The relief obtained was:
1. A use variance from the requirements of Sections 18-4.1a and 18-6.5e of the Ordinance (the R-22 Low Density Residential Zone District) to permit the proposed development of the Property with the dormitory, parking, tennis courts, public restroom and storm water management facilities.
2. A variance from Ordinance Section 18-6.3e.2 to permit more than one principal structure on a lot.
3. A bulk variance from Ordinance Section 18-6.5b for relief from the requirement that, in any zone, all required yards, open spaces, off-street parking and landscaping be contained within that zone.
4. A bulk variance from Ordinance Section 18-7.4a.3 to permit front yard parking.
5. A bulk variance from Ordinance Section 18-5 to permit a building height 7.5 feet above the maximum allowed height of thirty-five feet.
6. A variance from Ordinance Section 18-6.2 for relief from open space requirements of the Ordinance.
7. A bulk variance from Ordinance Section 18-7.2c to permit a front yard wall or fence more than three feet above ground.
8. A bulk variance from Ordinance Section 18-7.2e to permit installation of a ten-foot high open wire fence within school premises where eight feet is permitted.
9. A bulk variance from Ordinance Section 18-7.2i to permit a fence to be erected so that: "all supporting members are not on the inside surface *753 and shall not face the neighboring property."
10. A use variance from Ordinance Section 18-8.1 to permit expansion of a non-conforming use.
11. A bulk variance from Ordinance Section 18-7.2e to permit the proposed ten-foot high chain link tennis court perimeter fence, whereas a maximum open wire fence height of eight feet is permitted within a public park, playground or school premises.
12. A bulk variance from Ordinance Section 18-7.4a.1 with respect to the twenty-four foot wide driveway proposed.
13. A variance from Ordinance 18-7.4b.1 with respect to required loading spaces.
The subject property, designated as Block 38 and Block 30 on the tax map of the Borough of West Long Branch, is located in the R-22, Low-Density Residential Zone. Block 30 was a farm known as Kilkare Farm ("the Farm") located at the intersection of Pinewood and Beachwood Avenues. The balance of the Property, Block 38 (the North Campus), is located between Beechwood and Cedar Avenues and also bordered by Pinewood Avenue.
Seventeen public hearings were held before the Zoning Board on February 5, 2004; March 4, 2004; April 15, 2004; May 20, 2004; June 10, 2004; September 9, 2004; October 7, 2004; October 28, 2004; December 2, 2004; February 7, 2005; April 28, 2005; May 25, 2005; June 23, 2005; July 28, 2005; August 25, 2005; August 31, 2005; and December 15, 2005.
The Application is a result of the University's plan to provide housing for students who are living off-campus in motel facilities, build a new tennis center for University and community use, and provide for storm water management.
The residence hall is to be placed near existing dormitories in order to cluster student housing within the same area of the campus. All will be buffered from neighboring residential properties.
The testimony indicated the construction of the new residence hall would increase the impervious coverage on campus. As a result, the University proposes to use the property bordering the University campus on Block 30 (the Farm) for the storm water management facility, tennis center, and parking lot. The University believes its plan would be the least intrusive and most compatible with the neighboring residential uses.
In support of its Application, the University presented the testimony of William E. Fitzgerald, P.E., a licensed professional engineer; Richard Nelson, P.E., a licensed traffic engineer; Mykhaylo Kulynych, AIA, a licensed architect; Patricia Swannack, Vice-President for Administrative Services; Paul Phillips, P.P., a licensed professional planner; Moustafa Gouda, Geotechnical Engineer; and William Soukup, a Hydrogeologist Groundwater Modeler.
William E. Fitzgerald described the Application and the scope of the project. The residence hall would be located in the University's primary residential area on the North Campus, would have 196 beds, and be "very similar to the character of the existing residence halls" for the University. The planned parking area for the residence hall would accommodate approximately 126 parking spaces, with a paved surface, drainage, lighting, and landscaping.
As to Block 30 (the Farm), the University is seeking to refurbish an existing barn and to construct six tennis courts for University *754 and public use. The Farm will also include a 20-car parking lot and a detention basin to replace the existing basin on the North Campus. The tennis courts would only be used during daytime hours, and would not be lighted. Mr. Fitzgerald testified that the detention basin is an important use that would be landscaped, open space. It is significantly larger than the existing basin to better handle storm water run-off for the surrounding area.
On February 5, 2004, Mr. Fitzgerald concluded his direct testimony by generally discussing the benefits that will inure to the University and the Borough should the Board grant the Application:
The University has needs, as it has been expressed to me by various members of the administration and its Board of Trustees. We are trying to accommodate the needs in really the only area of the residential campus that is available and the need happens to be a need to have more students live on campus so they come out of private rentals and other residences within the community. . . .
. . . .
This was designed from an engineering point of view to attempt to mitigate the maximum extent possible or practicable any impacts on traffic and circulation, aesthetics, lighting, impact of site lighting, storm water management, any other impacts associated with a physical design as well as discussions on, as I stated, how to try to accommodate the University's need with a development proposal that was as unobtrusive as possible with respect to intensity in the R-22 zone.
During the course of the hearings, Mr. Fitzgerald further testified as to the University's efforts to address public concern over the tennis center. These concerns were addressed by the reduction of parking spaces and the addition of a public restroom in the footprint of the barn near the proposed tennis courts.
The University also presented the testimony of their traffic engineer, Richard Nelson, who testified that the proposed residence hall would have an "insignificant" impact on traffic flow.
The University's architect, Mykhaylo Kulynych, testified that he designed the new residence hall to be in character with the surrounding neighborhood. Mr. Kulynych also noted that he had attempted to minimize any negative impact of the residence hall, such as the effect of light and mechanical noise, through his design. The proposed residence hall would have the same height, roof lines, and color brick as the existing residence halls.
In describing the University's plans for the barn building, Mr. Kulynych noted that the proposed structure would not expand the square footage of the building itself, but that it would look better than the current barn building. Exterior finished materials, compatible with what is being used in the neighborhood, would be used.
At the May 20, 2004 Board hearing, the University's Vice-President for Administrative Services, Patricia Swannack, testified. Ms. Swannack described the University's need for additional dormitory space as opposed to using facilities such as the Esplanade Hotel. She stated:
We don't believe it is an appropriate quality of life issue. We believe they should be living with their peers, the other students on campus. We have to provide a shuttle seven days a week, for a significant amount of students, in a 24-hour period. There is also extensive difficulty with the students coming back and forth to campus because the Esplanade does not have cooking facilities or a *755 cafeteria on site. The students have to participate in the meal plan that is provided on campus.
Ms. Swannack opined the construction of the proposed residence hall would alleviate certain traffic issues near the school by eliminating the need of the students to commute to class and other campus activities.
Ms. Swannack further testified that the University had examined all options for Block 30 (the Farm) and had considered other alternatives to the tennis courts and storm water management basin. The University considered including additional parking lots, single-family homes for student groups, and relocating athletic fields. She testified there was no support for these uses by community groups. Accordingly, the University concluded that the tennis courts and basin were the most compatible use of the property which was a benefit to the community at large.
The University's planner, Paul Phillips, addressed the relevant criteria that had to be satisfied to grant the variances. He noted that the University's use of the Property is inherently beneficial and the residence halls and associated recreation and storm water facilities were all part of the inherently beneficial University use which needed to be in close proximity to the University.
Mr. Phillips reiterated that the new residence hall was proposed to meet an existing need of the University, to provide housing for students presently living off-campus in the Esplanade Hotel. The parking lot was designed to serve the additional student population that would be moving back to campus. Mr. Phillips testified that the proposed area for the new residence hall and the parking lot is the most logical and suitable location for those additional facilities.
Mr. Phillips noted a portion of Block 38 (North Campus) was previously the subject of a use variance that permitted residence halls. He felt the proposed location is the only logical one as the new residence hall would be immediately adjacent to existing residence halls.
Mr. Phillips further testified that the new parking area is essentially an expansion of the existing University parking area on the North Campus. The new parking lot would be fenced and buffered from the nearby residential neighborhood. He opined the proposal involves no significant change in the use of Block 38. Mr. Phillips felt that when examining the University's need and the existing and desired improvements, the proposed location for the new residence hall was ideal for both the University and the community.
Mr. Phillips further stated that the basin would convey a benefit to the community at large as it was designed to significantly improve drainage conditions above and beyond that which would normally be the University's responsibility. He noted that recreational facilities, such as tennis courts, "are often allowed by zoning in single-family, residential districts." He stated the tennis courts will be compatible with and available to the adjacent residences in the neighborhood.
In addition to serving the University's inherently beneficial purposes, Mr. Phillips also cited other special reasons that satisfied the positive criteria for the project. He testified the Application would promote the public welfare as it relates to the University's need to replace an off-site facility that is inconvenient and undesirable, and that the proposed site was particularly suited for a residence hall.
Mr. Phillips also testified that the Application meets many other purposes of the Municipal Land Use Law ("MLUL"). It will improve area-wide drainage and the *756 replacement of the barn/storage shed with new improvements on the same footprint would be an aesthetic visual and structural improvement of the existing structure. Mr. Phillips also noted that the proposed basin will promote open space.
Mr. Phillips addressed the negative criteria under the MLUL. He stressed that, the new residence hall and adjacent parking lot will be located in a block where there are similar facilities that would mitigate any adverse impacts associated with the D variance. He stated that the proposed building's orientation mitigates any visual impacts on the adjacent residential neighbors. Mr. Phillips discussed the University's plans to provide landscaping to shield headlights and strengthen the existing buffer for the parking lot. He testified he did not see any significant impact by the proposal on the adjacent neighborhood. Furthermore, he indicated that the University has taken several steps to minimize the impact of the tennis court and detention area on the adjacent residential neighbors by the utilization of fencing. Also, the tennis courts will not be lit or available for use before or after daylight hours.
In analyzing the impact of the University's Application on the Borough's zone plan, Mr. Phillips stated that Block 38 (North Campus) is already used for University purposes, variances having been previously given to construct three residence halls. As prior variances under similar circumstances had been granted, he felt this variance can be granted without substantial detriment to the Borough's zoning plan.
Moustafa Gouda, Geotechnical Engineer, testified for the University as to the lack of significant impact on the water table as a result of the proposed detention basin. Mr. William Soukup, a Geologist, also testified as to the lack of impact of the detention basin on the basements of nearby homes.
Ms. Diane Nieves, general manager of the Esplanade Motel, testified that University students currently occupy 88 rooms and the three-year lease is due to expire May 2005. She further indicated the University provides a shuttle to transport those students to campus.
Plaintiffs Joseph Hughes and Pamela Hughes offered testimony concerning their objections to the University's Application. Plaintiffs were generally concerned about additional noise, light, and traffic that the proposed improvements would bring to the area.
The objectors then presented testimony of a planner, Victor Furmanec, P.P. Mr. Furmanec confirmed that a university is an inherently beneficial use. Relying on an aerial photograph of the University campus, Mr. Furmanec identified a number of other areas that he felt could accommodate the proposed residence hall. Mr. Furmanec only did a "preliminary analysis" and was unaware of how the University presently used the alternative areas and whether they were, in fact, available for use.
Harry Ticehurst, a real estate broker and appraiser, also testified on behalf of the objectors. He indicated he would take a "negative adjustment" when doing an appraisal of a home located near the Property. No studies were conducted by him to quantify the impact of the University or the proposed improvements. Mr. Ticehurst admitted that in many new home developments, detention basins are required to control storm water, and that detention basins could have a positive impact in an area to deal with storm water management problems.
A realtor, Dot Schulze (herself an objector), then testified concerning her experiences *757 selling residential real estate in West Long Branch. Ms. Schulze testified that homes in the University's neighborhood take longer to sell, and sell for less money, but she has, in fact, sold fifteen or twenty homes in that neighborhood in the past three years.
In response to the objectors' comments, the University's engineer, Mr. Fitzgerald, testified that the University revised its Application. It increased the setback for the westerly line of the proposed parking lot; increased screening and landscaping to prevent headlights from shining into Mr. Hughes's home; reduced the size of the parking lot from 152 stalls to 126; changed the direction of vehicle circulation within the parking lot in an attempt to "better the situation for the residents of Pinewood Avenue;" and filled gaps in the existing buffer along Beachwood Avenue. Mr. Fitzgerald discussed the proposed storm water management basin and the Borough's flooding problems. It was his opinion that the University's proposal was the best that can be done in the water shed.
In order to address the concerns raised regarding the detention basin, the University presented three rebuttal witnesses. Mr. Gouda, Mr. Fitzgerald, and Mr. Soukup. All were of the opinion that the detention basin would benefit the community.
The Board then opened the hearing to public comment. Many members of the public objected to the University's Application and a number spoke out in favor of the University.
At the conclusion of the public comment and summations during the August 31, 2005 hearing, the Board deliberated and voted on the preliminary site plan and variances. The Board approved the Application 5 to 1.
The Board memorialized its decision by a Resolution dated November 17, 2005. The Board specifically found that the University provided "significant evidence of the need for the proposed new dormitory and related improvements." Moreover, the Board found that the University "has studied various alternative proposals, including possible group homes, single-family homes and special housing facilities for students, as well as plans which would have relocated University athletic fields and would have provided for additional student parking on the Property," but that "there are no available alternative properties which would satisfactorily facilitate development of the Project and meet the needs of the University."
Further, the Board found that the Application advances several purposes of zoning as defined under the MLUL, that the addition of the proposed facilities to serve the University cannot be achieved by any other reasonable alternative means, that the proposed improvements will not have a substantial detrimental impact on the surrounding area or community, that the proposed use would not result in any substantial detriment to the public good or substantially impair the intent and purpose of the master plan and zoning ordinance, and that the Property is particularly suited for the proposed use.
Additionally, the Board found that the University "constitutes an inherently beneficial use" and all components of the Application are "necessarily accessory" to the functioning of the University. While the University did not need to satisfy the "enhanced quality of proof' standard, it nevertheless demonstrated that the variances sought are consistent with the intent and purpose of the master plan and zoning ordinance. Finally, the Board found that the impacts from the Project would be de minimus as the University "satisfactorily *758 demonstrated methods to mitigate any potential impact" and that no substantial detriment to the public good would result from the approval of the Application. The Board found that the University satisfied both the positive and negative criteria, regardless of whether the Project was deemed to be an inherently beneficial use.
In an effort to challenge the Board members' consideration of the Application, the objectors questioned whether the members had disqualifying conflicts of interest by virtue of being alumni of the University, making contributions to the University, or other connections to the institution.
Prior to the hearing on this appeal, the court granted Plaintiff objector's motion to depose these Board members as to the conflict issue. The depositions revealed the following:
Rocco Christopher
Mr. Christopher has been a Borough resident for sixty-seven years and a member of the Board for over thirty years. He attended Monmouth College between 1958 and 1961 and received an Associate of Arts degree. Over the last twenty years, he has occasionally attended functions at the University for the West Long Branch Grammar School. He noted that before he retired, while teaching and coaching, he may have spoken to a representative from the University on behalf of one of his students trying to gain admission.
Mr. Christopher's youngest daughter also briefly attended the University for one semester in the spring of 2003 after leaving Pennsylvania State University. Mr. Christopher indicated that he may have donated ten dollars at some point, and that he has been solicited "a number of times" and "simply decline[d] because of his board membership." He further testified that he has no financial or personal interest in the University or its Application and cannot think of any reason that he should be disqualified from the Board for this matter.
Susan Juliano
Ms. Juliano transferred to the University in the Fall of 1979 and played on the tennis team for two seasons. She was awarded a degree in business administration in 1982. She has had no employment or professional relationship with the University since she graduated. She may have contributed to the University in the late 1980s or early 1990s prior to her appointment to the Board. She attended an informal reunion for the University's tennis team approximately four or five years ago, and stated that she occasionally receives mailings from the University.
Ms. Juliano also testified that, at some point ten or more years ago, she joined the University's fitness center for a three-month special because one of her friends was working there. Ms. Juliano stated that the fact that she graduated from the University and was on the tennis team did not, in any way, influence her ability to be fair and impartial on the University's Application.
Robert Springman
Mr. Springman graduated from the University in 1972 and, since that time, he has not maintained membership in any organization associated with it. He has not made any contributions to the University during the last twenty years. He occasionally receives "booklets" from the University in the mail containing information about "shows and things to do at Monmouth University for local people." He believes that this literature is provided to all area residents (regardless of whether they attended the University), and noted that he "usually toss[es] it." He attended a social event for University soccer players in 1976 and a dinner dance for the University's *759 Greek societies in the 1980s. He has no children that have attended the University and has no business or financial relationship with the University.
Irven Miller
Mr. Miller indicated that he has resided in the Borough for nineteen years and has served on the Board since 1995. Mr. Miller attended the University as an undergraduate between 1967 and 1970, and received a Master's Degree in the 1970s. He is a principal of Irven Bob Miller, Inc., which performs public bid service work for heating, ventilation, air conditioning, and emergency generator systems. Over the course of three months in 1990, his company installed two boilers at the University's Wilson Hall which was the only business done at the University. His company received the boiler work as a result of a public bid. His company has never bid on any other job at the University.
Since 1990, he has had no contact with the University other than his company wrote five checks made payable to the University between 2002 and the present. He was responsible for two of the checks: one of the checks was for a wine tasting event held at Wilson Hall run by an individual without any affiliation to the University. The other check was written to the University in honor of a deceased friend. The three remaining checks were for donations to the Friends of the Arts, a non-profit organization that presents various entertainment programs at the University. His mother was responsible for those donations.
Mr. Miller testified that he had recused himself from prior applications of the University because of the boiler work on advice of the Board's counsel, but that since fourteen years had passed between that boiler work and the instant Application, the Board's counsel advised Mr. Miller that no disqualifying conflict existed.
THE BOARD MEMBERS DID NOT HAVE SUCH "PERSONAL INVOLVEMENT" WITH THE UNIVERSITY SO AS TO CONSTITUTE A CONFLICT OF INTEREST.
Board members are presumed to be thoroughly familiar with their community's characteristics and interests, and are aware of local conditions and the uses that are appropriate for the area. Kramer v. Bd. of Adjust., Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965). To achieve this expertise Board members are expected to have contacts with local institutions and to be exposed to local facilities and local properties. There are times, however, when contacts with an applicant are excessive leading to a disqualification of a public official. Griggs v. Borough of Princeton, 33 N.J. 207, 219-20, 162 A.2d 862 (1960); Aldom v. Borough of Roseland, 42 N.J.Super. 495, 501, 127 A.2d 190 (App.Div.1956).
No member of a public board is permitted to act on any matter in which he or his family, or a business in which he has an interest, has a direct or indirect financial interest or involvement that may impair objectivity or independence of judgment. N.J.S.A. 40:55D-23(b); Care of Tenafly, Inc. v. Tenafly Zoning Bd. of Adjustment, 307 N.J.Super. 362, 369, 704 A.2d 1032 (App.Div.), certif. denied, 154 N.J. 609, 713 A.2d 500 (1998); N.J.S.A. 40A:9-22.5(d).
The decision as to whether a particular interest is sufficient to disqualify "is necessarily a factual one and depends upon the circumstances of the particular case." Wyzykowski v. Rizas, 132 N.J. 509, 523, 626 A.2d 406 (1993). The question will always be whether the circumstances could reasonably be interpreted to show a likely capacity to tempt an official to depart from a sworn public duty. Van Itallie v. Franklin Lakes, 28 N.J. 258, 268, 146 A.2d 111 *760 (1958); Wyzykowski, supra, 132 N.J. at 524, 626 A.2d 406.
The courts have also recognized the need to balance the policies behind the conflict of interest rules to avoid discouraging members of the public from entering public service. Not all interests possess the likely capacity to tempt the public official to depart from his sworn duty. See Barrett v. Union Twp. Comm., 230 N.J.Super. 195, 201, 553 A.2d 62 (App.Div. 1989). As the Supreme Court of New Jersey has noted in Wyzykowski, 132 N.J. at 523-24, 626 A.2d 406:
Local governments would be seriously handicapped if every possible interest, no matter how remote and speculative, would serve as a disqualification of an official. If this were so, it would discourage capable men and women from holding public office. Of course, courts should scrutinize the circumstances with great care and should condemn anything which indicates the likelihood of corruption or favoritism. But in doing so they must also be mindful that to abrogate a municipal action at the suggestion that some remote and nebulous interest is present, would be to unjustifiably deprive a municipality in many important instances of the services of its duly elected or appointed officials. The determinations of municipal officials should not be approached with a general feeling of suspicion, for as Justice Holmes has said, "Universal distrust creates universal incompetence."
Courts have recognized the necessity of having involved, informed, active members of the community act as the decision makers.
The plaintiffs argue that alumni of Monmouth University are per se disqualified from sitting on the Application at issue. The court is not aware of any legal authority supporting that contention.
Plaintiffs rely on the holding of McVoy v. Bd. of Adjust., Montclair Twp., 213 N.J.Super. 109, 516 A.2d 634 (App.Div. 1986), for the general proposition that board members who are also current members of an applicant or objector organization have a disqualifying conflict of interest. However, the facts of McVoy are clearly distinguishable. McVoy was an action in lieu of prerogative writs concerning the granting of a use variance to a church to use its rectory as a boarding house for senior citizens. The Appellate Division determined that two members of the Board of Adjustment had an impermissible conflict of interest because they were current members of the applicant church at the time of the application.
The Appellate Division has determined, however, that even recent past membership in an applicant organization is wholly insufficient to disqualify a board member. In Sugarman v. Twp. of Teaneck, 272 N.J.Super. 162, 639 A.2d 402, certif. denied, 137 N.J. 310, 645 A.2d 139 (1994), the plaintiffs contended that a member of the Board of Adjustment, who was also a former affiliate member of the synagogue, had a disqualifying conflict of interest. The court held:
Here, Senter had maintained her affiliate membership until she perceived that it might lead to an appearance of impropriety. She was not a member of the Congregation at the time of the hearings, and the record indicates that instead of belonging to any congregation, she worships in a private home. Although it might be said that the prior affiliate membership has the potential to create an appearance of impropriety, it appears remote . . . as she had given up that membership.
[Id. at 169, 639 A.2d 402.] *761

The Sugarman court upheld the grant of the variance, noting there was no indication of any actual pecuniary or personal interest, improper motive, or actual bias.
Religious affiliations are often continuous and fundamental to people's daily lives. Therefore, if past membership in a religious organization is insufficient to disqualify a board member, prior affiliation with an educational institution by a member of the board or their children, for a limited period, is insufficient as well.
In DePaolo v. Town of Ithaca, 258 A.D.2d 68, 694 N.Y.S.2d 235 (N.Y.App.Div. 1999), an action was brought to challenge Ithaca's amendment of its zoning ordinance and grant of zoning approvals in connection with Cornell University's plan to implement a new cooling system for campus buildings. The petitioners argued that the Ithaca Board's vote was tainted by participation of a Cornell University graduate student. The DePaolo court expressly determined that the graduate student did not have any impermissible interest in Cornell's application for a zoning change because he had no financial interest in the application.
Here, no facts or circumstances have been shown in the record or through discovery that would remotely suggest that the Board members in question had any disqualifying conflict of interest.
A conflict of interest arises when "the public official has an interest not shared in common with the other members of the public." Wyzykowski, supra, at 524, 626 A.2d 406. Monmouth University routinely offers its facilities (such as its tennis courts and library) for the community's use and enjoyment. Many members of the community take advantage of that opportunity. The University and its facilities are part of the fabric of the community. Board members who occasionally attend activities at the University or partake in its educational, cultural, athletic or social offerings are no different than any other citizen. Their ties to the University are no greater than those of any other residents. To hold that these Board members have an impermissible conflict of interest solely because of their use of, or casual involvement with, an integral part of the community they serve, would do nothing more than rob the public of their valuable expertise. The court holds there are no factual or legal reasons to declare a conflict on the part of any Board members.

THE UNIVERSITY'S APPLICATION WAS PROPERLY GRANTED BY THE BOARD
In an action in lieu of prerogative writs, the role of the Court is to review the Board's decision and determine whether the Board's actions are arbitrary and capricious based on the record below. See generally Burbridge v. Mine Hill Twp., 117 N.J. 376, 385, 568 A.2d 527 (1990); Kramer v. Bd. of Adjust., Sea Girt, supra, 45 N.J. at 296, 212 A.2d 153. Arbitrary and capricious action has been described as willful and unreasonable, without consideration, and in disregard of circumstances. An action is not arbitrary and capricious when exercised honestly and upon due consideration even though it may be believed that an erroneous conclusion has been reached. Bayshore Sewerage Co. v. Dep't. of Envtl. Prot., 122 N.J.Super. 184, 199-200, 299 A.2d 751 (Ch.Div.1973), aff'd., 131 N.J.Super. 37, 328 A.2d 246 (App.Div.1974).
The reviewing court is not permitted to substitute its judgment for that of the Board's, and may not interfere with or overturn the decision of the Board so long as there is substantial evidence to support the decision. See Kaufmann v. Planning Bd., Warren Twp., 110 N.J. 551, *762 558, 542 A.2d 457 (1988); Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood, 257 N.J.Super. 413, 456, 608 A.2d 914 (App.Div.1992), aff'd., 132 N.J. 327, 625 A.2d 483, cert. denied, 510 U.S. 991, 114 S.Ct. 547, 126 L.Ed.2d 449 (1993). Boards possess special knowledge of local conditions and must be accorded wide latitude in the exercise of their discretion. See Kramer, supra, 45 N.J. at 296-97, 212 A.2d 153.
Here, the Board had substantial evidence to support its decision to grant the Application.
The University applied for variances to permit the construction of a residence hall, parking lot, tennis courts and detention basin in the R-22 residential zone. Generally, this type of application requires proof of both positive and negative criteria. Sica v. Bd. of Adjust. of Twp. of Wall, 127 N.J. 152, 156, 603 A.2d 30 (1992). Under the positive criteria, a variance applicant must demonstrate special reasons for the grant of the variance. The applicant must prove that the use promotes the general welfare by showing the proposed site is particularly suitable for the proposed use. The negative criteria requires proof that the variance can be granted without substantial detriment to the public good. Smart SMR v. Fair Lawn Bd. of Adjust., 152 N.J. 309, 323, 704 A.2d 1271 (1998). There must also be a demonstration of an enhanced quality of proof that the variance sought is not inconsistent with the intent and the purpose of the master plan and zoning ordinance.
It is clear from the record that the University has satisfied all criteria. There is no dispute that the University, as an institution of higher learning, qualifies as an inherently beneficial use. Therefore, the University's burden is lessened as an inherently beneficial use presumptively satisfies the positive criteria. Smart, supra, 152 N.J. at 323, 704 A.2d 1271; Burbridge, supra, 117 N.J. at 394, 568 A.2d 527. As the University is an inherently beneficial use, satisfaction of the negative criteria does not depend on an enhanced quality of proof. Sica, supra, 127 N.J. at 160-61, 603 A.2d 30. In determining whether to grant a variance to an inherently beneficial use, a board of adjustment must balance the positive and negative criteria. In Sica, the court stated:
First, the board should identify the public interest at stake. Some uses are more compelling than others. . . . Second, the Board should identify the detrimental effect that will ensue from the grant of the variance. Certain effects, such as an increase in traffic, . . . or "some tendency to impair residential character, utility or value," . . . will usually attend any non-residential use in a residential zone. When minimal, such an effect need not outweigh an inherently beneficial use that satisfies the positive criteria. . . . Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use . . . If so, the weight accorded the adverse effect should be reduced by the anticipated effect of those restrictions. . . . Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.
[Id. at 165-66, 603 A.2d 30.]
Functions which are accessory to its inherently beneficial "core use" are included under its inherently beneficial umbrella. See Med. Ctr. at Princeton v. Princeton Twp. Zoning Bd. of Adjust., 343 N.J.Super. 177, 213, 778 A.2d 482 (App.Div.2001).
In Medical Center, the Appellate Division reviewed a zoning board's denial of *763 variances to a hospital to construct new support offices in a residential zone. The court established a three-pronged test for determining whether certain accessory uses to an inherently beneficial use may be included within the scope of the inherently beneficial use umbrella. The court stated:
A zoning board must: (1) identify the proposed use and delineate its function; (2) establish how the proposed use is integrated into the core function of the inherently beneficial use; and (3) establish why the specific location of the proposed use is necessary to advance the purpose of the inherently beneficial use.
[Id. at 185, 778 A.2d 482.]
Here, the proposed uses, a residence hall, parking lot, tennis courts, and a detention basin are all existing uses on the University campus and serve the core function of the University. By their very nature, they need to be located in close proximity to the University. Residence halls and accessory parking areas should be within walking distance of University buildings to avoid excessive traffic. Detention basins must be located on-site to retain storm water from nearby buildings and impervious coverage. Student-oriented activities and recreation facilities such as tennis courts should be in close proximity to the students and the public they will serve.
The Board was presented with significant evidence showing that the accessory uses in question were core functions within the University's inherently beneficial umbrella. The University's planner, Mr. Phillips, specifically addressed that issue. He noted, as did other witnesses, the University's need for an additional residence hall on its North Campus and reiterated his opinion that "this is the most particularly-suited location . . . for the additional residence hall and parking for this inherently beneficial use."
Mr. Phillips supported his opinion by undisputed facts: a portion of Block 38, North Campus, was previously the subject of a use variance that permitted residence halls; the area in question is presently utilized for University purposes; the proposed residence hall is "immediately adjacent" to existing residence halls; the new parking area is "essentially an expansion of the existing University parking area on the North Campus in Block 38" that can be fenced and buffered from the nearby residential neighborhood; the proposal involves no significant change in the use of Block 38; and the location of the proposed residence hall is presently "essentially undeveloped."
In addressing the detention basin for Block 30, Mr. Phillips testified as to the need to relocate the existing detention facility to accommodate the expanded parking in Block 38. He opined that the basin "would clearly convey a benefit to the community at large" as it was designed to "significantly improve" drainage conditions above and beyond that which would normally be the University's responsibility. He testified that recreational facilities, such as tennis courts, are often found and permitted by zoning in single-family residential districts.
It is clear from the testimony that the proposed uses are integrated into the core of the inherently beneficial University uses. They serve the student body and the public and are placed in ideal locations. The court finds the University has satisfied the positive criteria.
By their very nature, use variances result in a negative impact to neighboring properties as a non-permitted use is sought. To be denied, the detriment to the public good must be substantial. See N.J.S.A. 40:55D-70(d). Plaintiff objectors raised various concerns regarding noise, *764 light and traffic problems that could result from the proposed improvements. That evidence was overcome by that offered by the University.
Plaintiffs' planner attempted to identify alternative locations that could accommodate the residence hall through a "preliminary analysis" of alternative areas. No empirical studies were done and the planner was not aware if, in fact, those sites were available.
Plaintiffs' real estate broker and appraiser testified that the Application would have a negative market impact on neighboring properties. No empirical studies or data were offered to support this net opinion.
In contrast, the University's architect testified that the proposed residence hall was designed to minimize the light and noise emanating from it. The University's engineer testified that the University had revised its plan for the parking lot (including altering the traffic flow) in an attempt to further minimize Plaintiffs' light and noise concerns. In addition, the University's traffic engineer testified that the proposed improvements would not significantly increase the traffic in the area and it was also observed that traffic may, in fact, decrease as students would no longer be commuting to campus from off-campus.
Mr. Phillips stressed that the location of the new residence hall and parking lot in the same location as like facilities mitigates adverse impacts associated with the variance. Further, the proposed building's orientation and placement of the entrances mitigates any visual impacts on the adjacent residential neighbors.
Mr. Phillips testified that the University has taken steps to minimize the impact of the tennis court and detention area on the adjacent residential neighbors. These uses will be secured by fencing and buffering. The tennis courts will not be lighted or available for use before or after daylight hours.
By virtue of the above credible, well-reasoned testimony, the Board properly granted the University's Application. The Board properly found no substantial detriment to the public.
Plaintiffs assert that the University's project encroaches on the residential zone, therefore, violating the Master Plan. The court disagrees. The Master Plan has no specific prohibition of the proposed project. The Master Plan states that residential development should recognize the "established character of residential development within the Borough."
Block 30 is a residential block bordering the University. The court finds substantial evidence in the record that the proposed uses are consistent with residential zoning.
General public recreation facilities such as parks, public playgrounds, and tennis courts are often found within walking distance of residential areas. Such facilities are entirely consistent with residential zones and do not violate the established character of residential development in the Borough. In light of the alternatives permitted by the Zoning Ordinance, the proposed use is the least intrusive to the character of the neighborhood.
The Board considered the expert testimony, and had the discretion to accept or reject the testimony. See Allen v. Hopewell Twp. Zoning Bd., 227 N.J.Super. 574, 581, 548 A.2d 220 (App.Div.), certif. denied, 113 N.J. 655, 552 A.2d 177 (1988); Hawrylo v. Bd. of Adjust., 249 N.J.Super. 568, 579, 592 A.2d 1236 (App.Div.1991). The Board determined that the University satisfied the applicable positive and negative criteria. The court finds the Board's decision to grant the University the approvals *765 in question was based upon substantial evidence in the record and should not be overturned.

USURPATION OF ZONING AUTHORITY
The Borough filed a separate action challenging the Board of Adjustment decision as to the tennis courts, parking lot, and storm water detention facilities on Block 30 (the Farm). The basis of said challenge is that such action by the Board is a usurpation of zoning authority.
As indicated above, these facilities consist of six tennis courts available for public use during daylight hours, a parking lot sized to accommodate cars for the tennis courts, and a landscaped detention basin replacing an existing facility on the North Campus. It is the court's opinion the project is consistent with residential use and the granting of the variance is not the type of drastic change that rises to a usurpation of zoning authority.
Every use variance is a deviation from the Zoning Ordinance and the Master Plan for the community. Boards of adjustment have the power to grant variances in site-specific circumstances. See Paruszewski v. Twp. of Elsinboro, 154 N.J. 45, 53, 711 A.2d 273 (1998). Ordinarily, the manner in which a board of adjustment exercises its exclusive statutory power is not subject to monitoring by the governing body. Dover Twp. v. Bd. of Adjust. of Dover Twp., 158 N.J.Super. 401, 409-10, 386 A.2d 421 (App.Div.1978). The legislature did not intend the governing body to infringe on the prerogatives of the zoning board as that board is particularly well-equipped to make those decisions due to their local insight and knowledge. The municipal governing body may not judicially challenge the propriety of a particular board decision, provided the board of adjustment has acted within the ambit of its authority. Twp. of North Brunswick v. Zoning Bd. of Adjust. of North Brunswick, 378 N.J.Super. 485, 490, 876 A.2d 320 (App.Div.), certif. denied, 185 N.J. 266, 883 A.2d 1063 (2005).
New Jersey courts have recognized, however, that under those limited circumstances when a board of adjustment has exceeded its statutory powers, the municipal governing body may institute an action to assert its legislatively conferred authority. Dover, supra, 158 N.J.Super. at 409-10, 386 A.2d 421. In Dover, the municipal governing body brought an action after the board of adjustment granted a variance that would allow the cluster development of an 81-acre parcel located in the township's rural zone. The project was approved in accord with the standards of the R-200 zone. The municipal governing body alleged that the board of adjustment had usurped the function reserved to the governing body, by in essence changing the zone. The Dover court stated:
The basic inquiry in each case must be whether the impact of the requested variance will be to substantially alter the character of the district as that character has been prescribed by the zoning ordinance. That inquiry requires analysis and evaluation of such factors as the size of the tract itself; the size of the tract in relationship to the size and character both of the district in which it is located and the municipality as a whole; the number of parcels into which it is anticipated that the tract will be subdivided if subdivision is part of the plan, and the nature, degree and extent of the variation from district regulations which is sought. The test of whether the board has been engaging in proscribed legislation must ultimately be one of both geographic and functional substantiality vis-a-vis the plan and scheme of the municipality's zoning ordinance.
*766 [Id. at 412-13, 386 A.2d 421.]
In order to prevail, the governing body must prove a substantial alteration of the character of the district. Vidal v. Lisanti Foods, Inc., 292 N.J.Super. 555, 564, 679 A.2d 206 (App.Div.1996); Feiler v. Fort Lee Bd. of Adjust., 240 N.J.Super. 250, 255-56, 573 A.2d 175 (App.Div.1990), certif. denied, 127 N.J. 325, 604 A.2d 600 (1991); Chesterbrooke Ltd. P'ship v. Planning Bd. of Twp. of Chester, 237 N.J.Super. 118, 128, 567 A.2d 221 (App.Div.1989), certif. denied, 118 N.J. 234, 570 A.2d 984 (1989); and Twp. of North Brunswick v. Zoning Bd. of Adjust. of North Brunswick, 378 N.J.Super. 485, 490, 876 A.2d 320 (App.Div.2005).
In this matter the court holds the Board's actions were fully within its authority and not a usurpation of the governing body's prerogative. That portion of the Property that is the subject of the Borough's concern is 4.38 acres. When compared to the size of the R-22 zone and the Borough itself, the subject area is small. The University's planner credibly testified that the proposed improvements are similar in nature to those found in R-22 districts. Given the size and nature of the proposed improvements, it is clear that they will not substantially alter the character of the district. In fact, the proposed uses will be less intrusive to the district than others that are permitted. Public recreation and storm water facilities do not violate the Master Plan.
The Borough asserts that the Master Plan prohibits further encroachment of University facilities in residential zones. The court does not agree; the Master Plan has no such prohibition. The Master Plan merely provides that residential development should be encouraged "in recognition of the established character of residential development within the Borough."
The established character of the neighborhood is a residential area adjoining a University campus; the proposed facilities are commonly placed in residential zones and provide an excellent non-intrusive transition. If private homes were built on Block 30, each would have driveways, parking areas and storm water facilities. The proposed landscaped detention basin, parking lot and tennis facility will have less of an impact on the residential district than the permitted uses and they will be heavily buffered. The proposed uses do not radically alter the Zone Plan or violate the spirit and intention of the Master Plan.
Plaintiffs rely on Twp. of North Brunswick v. Zoning Bd. of Adjust. of North Brunswick, supra, 378 N.J.Super. 485, 876 A.2d 320, in support of their position. The facts are wholly distinguishable from the instant matter. In North Brunswick, the Board of Adjustment granted use and bulk variances to permit the construction of a four-story, luxury apartment building which would result in an eight-fold increase in the permitted density. The Board made this decision in the face of a zoning ordinance that had been amended "for the express purpose of avoiding excessive density in this predominantly residential neighborhood" one year before the grant of the use variance. Unlike North Brunswick, West Long Branch's Master Plan and Zoning Ordinance provide general and non-site specific statements. There are no recommendations regarding appropriate density or uses, and no policy decisions relating to the expansion of University facilities into residential districts.
This court holds that the University's Application does not violate any express provision of the Master Plan, nor does the proposal substantially alter the nature of the district. The court holds the approved Application is not a "drastic change" that warrants the Borough's intervention, or *767 the court's reversal of the decision of the Board of Adjustment.
The Board of Adjustment properly considered the proofs and granted the University's Application based on the substantial evidence before it. The Board did not exceed its authority under the Municipal Land Use Law and its members are not disqualified from voting due to any conflict of interest.
For the reasons and authorities detailed above the Zoning Board of Adjustment's action is affirmed and Plaintiffs' complaints are dismissed.