**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3710-19

THE RIDGE AT BACK BROOK, LLC, a New Jersey limited liability company,

     Plaintiff-Respondent,

v.

THE EAST AMWELL TOWNSHIP PLANNING BOARD, a/k/a THE EAST AMWELL TOWNSHIP LAND USE BOARD, THE TOWNSHIP OF EAST AMWELL, THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EAST AMWELL, and RICK WOLFE, in his capacity as Mayor and Member of the Township Committee of the Township of East Amwell and as a Member of the Planning Board of the Township of East Amwell,

     Defendants-Appellants.

_____

Submitted February 24, 2021 – Decided July 20, 2021

Before Judges Sumners and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Docket No. L-0204-19.

Ventura, Miesowitz, Keough & Warner, PC, attorneys for appellants (Jolanta Maziarz, on the briefs).

Wilentz, Goldman & Spitzer, PA, attorneys for respondent (Brian J. Molloy and Steven J. Tripp, of counsel and on the brief; Pierre Chwang, on the brief).

PER CURIAM

Defendants East Amwell Township, the East Amwell Township Planning Board, the Township Committee of East Amwell Township, and East Amwell Township Mayor Rick Wolfe (collectively defendants) appeal from an April 29, 2020 Law Division order granting plaintiff The Ridge at Back Brook, LLC's motion for summary judgment, enjoining Mayor Wolfe from participating in any future legislative or quasi-judicial proceedings involving plaintiff, and invalidating an April 10, 2019 amendment to the Master Plan of the Township of East Amwell. After considering the record and in light of the applicable law, we affirm.

The facts material to this appeal are undisputed.

<u>The Parties</u>

Plaintiff has owned and operated about 300 acres of property (the Property) located in East Amwell Township, New Jersey. In 2002, The Ridge

at Back Brook Golf Club (The Ridge) opened on the Property and has since been run by its principal, Joel D. Moore (Moore).

Defendant East Amwell Township Planning Board (the Board), also known as the East Amwell Township Land Use Board, is the duly constituted Planning Board of the Township of East Amwell. The Board exercises the powers of a planning board as well as those of a zoning board of adjustment pursuant to N.J.S.A. 40:55D-25(c).

Defendant Township of East Amwell (the Township) is a municipal corporation of the State of New Jersey. Defendant Township Committee of the Township of East Amwell (the Committee) is the Township's duly constituted governing body, exercising the powers of a township committee. Defendant Rick Wolfe (Wolfe) is the Mayor of the Township and is a voting member of both the Committee and the Board.

Political History of East Amwell

Since the 1980's, candidates supported by the East Amwell Democratic Association (EADA) held a majority on the Committee. In 2016, Wolfe brought allegations against the EADA-controlled Committee, accusing the members of misappropriating approximately $1,200,000 from the Township's farmland preservation trust. The New Jersey Department of Community Affairs

investigated and determined that expenditures were improperly charged to the fund, but did not require that the money be reinstated.

In the Township's 2016 elections, Wolfe and another East Amwell resident ran as Republicans and won. In 2017, two more of the EADA-supported Committee members were replaced by Republican candidates. Following the 2018 elections, EADA lost its final seat on the five-member Committee. Wolfe was appointed Deputy Mayor in January 2018. In January 2019, he became Mayor and was re-appointed in January 2020.

Construction of The Ridge

The Property is located in the Amwell Valley Agricultural District (AVAD), which imposes building restrictions intended to maintain the community's rural atmosphere. In 1999, upon application by Moore, the Board adopted Ordinance No. 99-20, which amended Section 92-91 of the Township's Code, to make the operation of a golf course or club a permitted use in the AVAD, subject to certain criteria. The ordinance specifically stated that the required criteria "shall not be construed as conditions of a conditional use."

Site plan approvals and amendments were granted by the Board beginning in October 2000, culminating in the final site plan approval with amendments in June 2002. Construction of the golf course began in early 2001. The Ridge

A-3710-19

opened for limited use in July 2002 and was fully opened when construction was completed in 2003. A clubhouse was subsequently built and opened in July 2004.

On June 9, 2016, following public hearings and testimony given by experts from both The Ridge and the Township, the Committee adopted Ordinance No. 16-04 (the 2016 Amendments) which amended the golf course provisions included in Section 92-91(B)(9). The amendments permitted several ancillary uses of the Property, including a swimming pool, tennis courts, and lodging for overnight accommodations. While the 2016 Amendments were in effect, plaintiff did not request approval for any ancillary uses.

The Helistop and Tax Appeals

In 2006, plaintiff filed an application with the Board for approval to construct and operate a helistop on the Property, which was denied in March 2006.[1] In 2008, plaintiff filed a second application for a helistop, this time at a different location on the property and with a limitation of thirty-two round-trip flights per year. Plaintiff's second application was denied in October 2008.

_____

[1] A helistop is "[a] minimally developed helicopter facility for boarding and discharging passengers or cargo. The [heliport/helistop] relationship is comparable to a [bus terminal/bus stop] relationship with respect to the extent of services provided or expected." FED. AVIATION ADMIN., AC NO. 150/5390-2B, HELIPORT DESIGN (2004).

In 2015, this court determined that the New Jersey Department of Transportation (NJDOT) has "the ultimate authority as to the placement of aeronautical facilities" and therefore may approve helistops, regardless of local zoning prohibitions. Twp. of Fairfield v. State, Dep't of Transp., 440 N.J. Super. 310, 318-20 (App. Div. 2015) (quoting Garden State Farms, Inc. v. Bay, 77 N.J. 439, 454 (1978)). In October 2018, plaintiff filed an application with the NJDOT seeking approval to construct and operate a helistop that would have a maximum of eight take-offs and eight landings per month, from April through December each year. On April 16, 2019, the NJDOT approved plaintiff's helistop application.

On November 29, 2018, while plaintiff's application to the NJDOT was pending, the Committee held a special public meeting to address the application. Numerous residents and a local environmental group attended to oppose the helistop. During the meeting, Wolfe requested to speak as "a member of the public" and made several disparaging statements about plaintiff including:[2]

> [WOLFE]: The Ridge [is] not behaving neighborly. And they have [not] behaved neighborly and this really starting to bother me as a resident of this [town]. My wife and I are the single largest individual taxpayer in

[2] Plaintiff appealed its property tax assessments each year from 2013 through 2019. The November 29, 2018 special public meeting was held while settlement negotiations were ongoing.

East Amwell.  Could . . . I challenge the assessment on my property, yes.  Can I get it reduced if I challenged it?  Probably.  Do I intend to challenge it?  No.  I am a resident of this town.  This is a great [t]own.  I have an obligation to make a contribution to this town, a financial contribution so the town can continue to function.

The Ridge is challenging its property tax assessment. . . . [and] to come, take us into court and argue that it's only worth [six] million dollars, to me is outrageous[,] it's not neighborly.  It's not doing anything to benefit this town.

Now . . . I am a tax lawyer actually so I'm not a big fan of people [overpaying] taxes.  But you do have an obligation to your community and he is not fulfilling that obligation.  He is slapping us in the face.  He is throwing us a giant middle finger.  And he is now doing it again on this helistop[,] he is throwing us a giant middle finger. . . .

. . . If he moves forward with this helistop, he has fundraisers [at] that club that I have been to for politicians running for office[,] I will not attend a [fundraiser] at that club[,] and I will let everyone that I know[,] know when fundraisers are being had at that club by politicians and not only will I not attend, I will not vote for any politician that has a fundraiser at that club.  I will not make a donation to [any] organization that patronizes that club.  I will stick signs on my farm and in fact if anybody wants the same signs, I will pay to have them made and hand them out to people as many people who want them.

MEMBER OF THE PUBLIC:  Helistop, hella no[!]

[WOLFE]:  Right. I like that.  Perfect.

. . . I'm not kidding. I am . . . tired of getting the middle finger.

. . . .

. . . People do for each other in East Amwell. We don't throw each other the middle finger. That's not the way we live here. I'm tired of it. So I have a different perspective on this. I have an economic perspective. He want[s] to make our life a living hell[?] I'm going to do what I can to make his life a living hell.

On January 3, 2019, plaintiff and the Township executed a stipulation of settlement which disposed of all complaints and cross-claims related to plaintiff's tax assessment appeal. The settlement, which was proposed by the Township, reduced plaintiff's tax assessment by approximately fifty percent, from roughly $10,600,000 to $5,347,200.

2019 Master Plan and Zoning Amendments

On April 10, 2019, the Board conducted a public hearing on a proposal, which Wolfe helped draft to suggest to the Committee certain amendments to Township's Master Plan. The suggested revisions applied only to golf courses and clubs located in the AVAD. Because The Ridge is the only golf course located in the Township, plaintiff was the only member of the community the proposed amendments would directly affect. The proposal recommended:

1.  Golf courses should be reclassified as a conditional use in the AVAD, not a permitted use. . . .

2.  The permitted use should be defined as a golf course with customary accessory buildings, structures and uses, including a clubhouse.  Other accessory uses not specifically related to the sport of golfing should be expressly prohibited, including but not limited to swimming pools, tennis courts, guesthouses[,] and helistops . . . .
3.  Golf tournaments that will attract a significant number of spectators should be expressly prohibited

        . . . .

4.  Best Management Practices shall be employed to prevent and/or minimize adverse impacts of the golf course on groundwater and surface water resources, and any deviation from the approved Integrated Turf Management Plan, Integrated Pesticide and Pest Management Plan, Water Use Budget and Water Recycling Plan and the Aquifer Test Plan should only be approved by the East Amwell Township Committee following a mandatory review by, with recommendations from, the local Board of Health

        . . . .

5.  Any golf course that is a Certified Audubon Cooperative Sanctuary may be presumed to be operating in a manner consistent with the environmental goals and objectives of the Township as long as the course's certification is current and valid

        . . . .

9

Moore appeared at the hearing with counsel. Before the Board began its presentation, Moore's counsel objected to Wolfe's participation in the vote based on his conduct, and requested that he recuse himself. Wolfe refused. At the conclusion of the hearing, the Board adopted the proposal by a vote of seven to one.

Wolfe subsequently drafted and posted to the Township's website a report summarizing the history of applications plaintiff has made to the Board since 1998. The report quoted the Board's meeting minutes and letters from plaintiff's attorney to the Board. Wolfe criticized several statements plaintiff made in 1999, prior to The Ridge's construction, regarding plaintiff's vision of what the club would be. Wolfe noted that plaintiff had initially indicated he wanted to build a "pure" golf course that did not include the traditional amenities offered by country clubs such as a swimming pool, tennis courts, and overnight lodging, and certainly not a helistop.

The report also averred that plaintiff's tax contribution was no longer what was anticipated by previous Board members when deciding to adopt the ordinances that allowed The Ridge to be constructed. Wolfe suggested the 2016 Amendments be repealed because the favorable treatment that the Board

10

previously bestowed upon plaintiff had not resulted in a significant benefit to the Township.

On May 9, 2019, about three weeks after plaintiff's helistop application was approved by the NJDOT, the Committee introduced Ordinance No. 19-10 (the 2019 Amendments), which essentially adopted the Board's suggested revisions to the Township's Master Plan. The ordinance amended Chapter 92 of the Township's Code by:

> a. Changing the definition of golf course/club in Section 92-4 of the Code of East Amwell to delete "structures for overnight accommodation for use by members and their guests," and "swimming and tennis facilities as is customary for use by members and their guests and customary accessory buildings and structures for the maintenance and operation of the facility."
>
> b. Eliminating "golf course/club" as a permitted use in the AVAD by deleting Section 92-91(B)(9) of the Code of East Amwell in its entirety.
>
> c. Reclassifying "golf course/club" as a conditional use by creating a new Section 92-91(B)(7), and setting forth eight conditional use standards.
>
> d. Eliminating accessory uses, including swimming pools, tennis courts, and guest houses, thereby repealing the 2016 Amendment that specifically permitted such uses.

11

On June 13, 2019, a public hearing and a regular Committee meeting were conducted to consider the 2019 Amendments for final adoption. Moore appeared with counsel, who again objected to Wolfe's participation in consideration of the ordinance and requested his recusal. The request was denied, and Wolfe participated in the meeting and the vote. In fact, Wolfe was the only member of the Committee to comment on Ordinance No. 19-10.

Before Wolfe gave his speech, six members of the public requested to be heard by the Committee; four opposed the ordinance and two supported it. Each person that spoke out against the ordinance expressed concern that Wolfe's personal feelings about plaintiff had impaired his objectivity of judgment:

> MR. MILLER: I don't know exactly what issue the [T]ownship or a certain person has with this individual.
>
> But this document here that I received by registered mail caused me to go do some digging. And I have read the full [twenty-eight] pages of the lawsuit. And I have read this [ordinance]. This is a vile, evil, disgraceful, vindictive amendment that you folks are going to sit up there, and in your conscience[,] go along with trying to tell some golf business, any new business that might be coming into town, how they need to operate.
>
> . . . .
>
> I don't see how they create any burden on the [T]ownship and they preserve green space[s]. This is the result of one person saying, ["]I am going to make

another person's life a living hell.["]  And each one of you people sitting there is going to support that.  I would ask you to look deeply in your conscience and say[, "]is this really good for the [T]ownship?["]  This silly, inane crap that is in here to be [vindictive] against one person?

. . . .

. . .  [W]e all stood and said the Pledge of Allegiance.  And the last phrase kind of really struck me in my heart, that said justice for all.  And I feel that apparently some people in front of me here don't subscribe to that feeling, and I feel ashamed for that.

MEMBER OF THE PUBLIC:  You're putting things in there that are ridiculous.  And I'm hoping, okay, they err on the side of caution here and get a little back bone.  And if . . . it's better for the town, for the greater good to recuse yourself, show that you're going to support the people of East Amwell . . . .

MR. WEITZER:  So as I sit here today and hear both sides, I feel like it's national politics, and it's no longer about law or anything else.  It's just a personal vendetta.  One side hates the other.  And you know, I ask, ["]when did . . . the politics stop being about working for the town and people[?"]  It's just like a personal vendetta.

And I understand you may not like Mr. Moore, and trust me, I get it.  But I just feel the two sides are going after each other.  And you know you are trying to hurt Mr. Moore and the Ridge.  You . . . are not hurting Mr. Moore. Mr. Moore is not paying for these attorneys sitting here, the members are.  Plain and simple.  And the money that you're going to have to spend, the [T]ownship is going to have to spend, isn't coming out of, much out of y'alls [sic] pockets.  It's on the

13

taxpayers['] money. And I [just] think . . . cooler heads need to prevail.

MR. DOHERTY: I see nothing compelling leading us to get that we need this proposed ordinance passed. And as a property owner, I find it troubling that anything that would restrict or roll back property rights that . . . already exist for anyone, in any real estate entity. I find a real problem with that. So without a compelling reason for this[,] I feel as much as this affects the golf course, it affects each one of us, so thank you.

Wolfe then spoke at length about plaintiff's tax appeals, helistop applications, and the circumstances surrounding the Committee's adoption of the 1999 and 2016 amendments that allowed The Ridge to be constructed and granted additional ancillary uses. Wolfe accused plaintiff of not being a "good neighbor" because he challenged the Ridge's property tax assessment, and for filing a helistop application with the NJDOT, thereby circumventing the Board's approval.

With regard to the approval process leading to the 1999 and 2016 amendments to the Code of East Amwell, Wolfe insinuated that plaintiff bribed Township officials:

Did money in some fashion change hands? I can't say for sure but [the documents] certainly raised the specter of buying approval in 2001.

. . . .

14

> Finally, the entire process from the beginning in 1998 through 2017, has at the very least a very dark cloud hanging over it: closed door meetings, apparently many in number, back room deals, undisclosed personal interests, improper purposes for enacting ordinance, perhaps influenced by donations.

During the speech, Wolfe specifically named Fred Gardner and Don Riley as former members of the Board that engaged in shady dealings with plaintiff in 2016. Wolfe also accused plaintiff of perjury, referencing plaintiff's tax appeals, and improperly soliciting political favors from former Board members. At the conclusion of the hearing, the Committee unanimously voted to adopt Ordinance No. 19-10.

Gardner, who served in various municipal legislative positions of East Amwell from 1986 to 2017, and Riley, a former member and Chairman of the Board who served from 2001-2018, were subsequently deposed.[3] Both flatly rejected Wolfe's corruption allegations and testified that there was no factual basis for any of the claims. Gardner testified that Wolfe made no attempt to discuss the allegedly improper approvals with him prior to making the June 13, 2019 allegations. Reilly testified that in early 2018, Wolfe called him and asked

---

[3] Gardner did not serve in any municipal positions from 1989 to 1992 or 2003 to 2005.

why the Board had approved the 2016 Amendments. Reilly told Wolfe that he voted to approve the 2016 Amendments because the ancillary uses plaintiff had requested were customary amenities for a golf club. Notwithstanding that brief conversation, Reilly testified that Wolfe had not discussed the factual basis for the approvals, or alleged corruption, with him prior to making the June 13, 2019 allegations.

On July 22, 2019, plaintiff filed an amended complaint in lieu of prerogative writs seeking to invalidate the 2019 Amendments, to enjoin Wolfe from participating in any local government action in matters involving plaintiff, and attorney's fees. On February 24, 2020, plaintiff moved for summary judgment and, on March 20, 2020, defendants cross-moved for summary judgment. On April 29, 2020, the motion judge granted plaintiff's motion and denied defendants' cross-motion, issuing a twenty-three page statement of reasons.

On appeal, defendants raise the following issues for our consideration.

POINT I

THE TRIAL COURT ERRED BY MISAPPLYING THE NEW JERSEY LOCAL GOVERNMENT ETHICS LAW, N.J.S.A. 40A:9-22.2, THE MUNICIPAL LAND USE LAW, N.J.S.A. 40:55D-23, AND THE COMMON LAW TO WOLFE'S STATEMENTS AND IN FINDING THAT WOLFE

16

HAD AN IMPERMISSIBLE CONFLICT OF
INTEREST WITH REGARD TO PLAINTIFF.

POINT II

THE TRIAL COURT ERRED BY MISAPPLYING
THE SUMMARY JUDGMENT STANDARD AND
NOT CONSTRUING THE FACTS IN THE LIGHT
MOST FAVORABLE TO THE PARTY OPPOSING
THE MOTION.

POINT III

THE TRIAL COURT ERRED BY IMPROPERLY
RESOLVING OR TAKING A POSITION ON ISSUES
RELATED TO WOLFE'S STATE OF MIND IN
DETERMINING TO GRANT PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT.

POINT IV

THE TRIAL COURT ERRED BY PROHIBITING
WOLFE FROM PARTICIPATING IN ANY
PROCEEDING OR TAKING ANY ACTION ON ANY
MATTER INVOLVING PLAINITFF OR
PLAINTIFF'S PROPERTY BASED UPON WOLFE'S
ALLEGED IMPERMISSIBLE CONFLICT OF
INTEREST WITH RESPECT TO THE 2019
ENACTMENTS.

We review a grant of summary judgment using the same standard that
governs the motion judge's decision. RSI Bank v. Providence Mut. Fire Ins.
Co., 234 N.J. 459, 472 (2018) (citing Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).
Under that standard, summary judgment will be granted when "the competent

evidential materials submitted by the parties," viewed in the light most favorable to the non-moving party, show that there are no "genuine issues of material fact" and that "the moving party is entitled to summary judgment as a matter of law." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat, 217 N.J. at 38); accord R. 4:46-2(c).  "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande, 230 N.J. at 24 (quoting Bhagat, 217 N.J. at 38).  Nevertheless, we review de novo the law governing conflicts of interest, including the statutory and common law.  Piscitelli v. City of Garfield Zoning Bd. of Adjustment, 237 N.J. 333, 350 (2019) (citing Dunbar Homes, Inc. v. Zoning Bd. of Adjustment of Twp. of Franklin, 233 N.J. 546, 559 (2018)).

The parties agree upon the statutory and interpretive caselaw that governs the issues presented in this appeal, but argue proper application of the law leads to opposite results.  Defendants argue the trial court erroneously found Wolfe's critical and negative statements toward plaintiff demonstrated a perceived bias that was sufficient to require his recusal from matters involving The Ridge.  A perceived bias, defendants contend, is not the standard.  If local officials were

not allowed to make public criticisms of important local issues they would be encouraged not to share their views with constituents. They argue that a disqualifying conflict of interest arises only when that interest is not shared in common with other members of the public. To require public servants to act dispassionately or to require officials to conceal their opinions—which would be the result under the trial court's standard—would serve to preclude local government officials from carrying out their duties truthfully and to the best of their ability.

"The overall objective 'of conflict of interest laws is to ensure that public officials provide disinterested service to their communities' and to 'promote confidence in the integrity of governmental operations.'" Id. at 349 (quoting Thompson v. City of Atlantic City, 190 N.J. 359, 364 (2007)). Resolving whether a conflict of interest prevented Wolfe from participating in matters affecting the Ridge is governed by the Local Government Ethics Law (LGEL), N.J.S.A. 40A:9-22.1 to -22.25, the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, and the common law. Piscitelli, 237 N.J. at 349-50.

"The [LGEL] applies to all municipal office holders, including mayors . . . [and] members of planning boards and zoning boards of adjustment." Id. at

19

A-3710-19

350; see also N.J.S.A. 40A:9-22.3(g).  In adopting the LGEL, the Legislature

recognized:

> a.  Public office and employment are a public trust;
>
> b.  The vitality and stability of representative democracy depend upon the public's confidence in the integrity of its elected and appointed representatives;
>
> c.  Whenever the public perceives a conflict between the private interests and the public duties of a government officer or employee, that confidence is imperiled;
>
> d.  Governments have the duty both to provide their citizens with standards by which they may determine whether public duties are being faithfully performed, and to apprise their officers and employees of the behavior which is expected of them while conducting their public duties . . . .
>
> [N.J.S.A. 40A:9-22.2(a) to (d).]

Thus, the LGEL aims to "make ethical standards in state and local

government 'clear, consistent, uniform in their application, and enforceable on

a statewide basis.'" Grabowsky v. Twp. of Montclair, 221 N.J. 536, 552 (2015)

(quoting Wyzykowski v. Rizas, 132 N.J. 509, 531 (1993)).

In that regard, N.J.S.A. 40A:9-22.5(d) provides that:

> [n]o local government officer or employee shall act in his [or her] official capacity in any matter where he [or she], a member of his [or her] immediate family, or a business organization in which he [or she] has an

interest, has a direct or indirect financial or personal involvement that might reasonably be expected to impair his [or her] objectivity or independence of judgment . . . .

Next, the MLUL applies specifically to members of municipal zoning boards, and it provides that no member of a zoning board "shall be permitted to act on any matter in which he [or she] has, either directly or indirectly, any personal or financial interest." N.J.S.A. 40:55D-69; Piscitelli, 237 N.J. at 352; Grabowsky, 221 N.J. at 552.

Similar to the statutory requirements of the LGEL and the MLUL, in Wyzykowski, the Court enunciated the four situations under the common law where a public official is disqualified on conflict-of-interest grounds. 132 N.J. at 525-26. Specifically, an official is disqualified when he or she has:

> (1) "[d]irect pecuniary interests," when an official votes on a matter benefitting the official's own property or affording a direct financial gain; (2) "[i]ndirect pecuniary interests," when an official votes on a matter that financially benefits one closely tied to the official, such as an employer, or family member; (3) "[d]irect personal interest," when an official votes on a matter that benefits a blood relative or close friend in a non-financial way, but in a matter of great importance, . . . and (4) "[i]ndirect [p]ersonal [i]nterest," when an official votes on a matter in which an individual's judgment may be affected [such as] membership in some organization and a desire to help that organization further its policies.

[Ibid.]

The overarching principle of the conflict-of-interest provisions under the LGEL, the MLUL, and the common law is that "[a] citizen's right to 'a fair and impartial tribunal' requires a public official to disqualify himself or herself whenever 'the official has a conflicting interest that may interfere with the impartial performance of his [or her] duties as a member of the public body.'" Piscitelli, 237 N.J. at 352-53 (quoting Grabowsky, 221 N.J. at 551). In resolving whether an official has a disqualifying interest, "[t]he question is not 'whether a public official has acted dishonestly or has sought to further a personal or financial interest; the decisive factor is "whether there is a potential for conflict."'" Id. at 353 (quoting Grabowsky, 221 N.J. at 554). To answer that question, a court must determine "whether the circumstances could reasonably be interpreted to show that [conflicting interests] had the likely capacity to tempt the official to depart from his [or her] sworn public duty." Ibid. (first alteration in original) (quoting Wyzykowski, 132 N.J. at 523).

Courts should, however, apply the conflict-of-interest rules cautiously, as "[l]ocal governments would be seriously handicapped if every possible interest, no matter how remote and speculative, would serve as a disqualification of an official." Grabowsky, 221 N.J. at 554 (alteration in original) (quoting

22

Wyzykowski, 132 N.J. at 523). Indeed, public officials "cannot and should not be expected to be without any personal interest in the decisions and policies of government." N.J.S.A. 40A:9-22.4; see also Grabowsky, 221 N.J. at 554 ("It is essential that municipal offices be filled by individuals who are thoroughly familiar with local communities and concerns."). Accordingly, "the nature of an official's interest must be carefully evaluated based on the circumstances of the specific case." Grabowsky, 221 N.J. at 554 (citing Van Itallie v. Borough of Franklin Lakes, 28 N.J. 258, 268 (1958)).

Applying these principles to the facts of this case, we conclude that the trial court correctly applied the LGEL, MLUL, and common law to find Wolfe's recusal was required from participation in both the drafting and voting procedures related to the 2019 Amendments. The public statements that Wolfe directed at plaintiff regarding the helistop application and tax appeals, as well as the unsubstantiated corruption allegations, followed by the drafting and passage of the 2019 Amendments, viewed objectively, present circumstances that could reasonably be interpreted to show that Wolfe's personal bias had the likely capacity to tempt him to depart from his sworn public duty. Piscatelli, 237 N.J. at 352-53.

A public official's personal interest may be a disqualifying conflict. Grabowsky, 221 N.J. at 555-557 (citing Barrett v. Union Twp. Comm., 230 N.J. Super. 195 (App. Div. 1989); and McNamara v. Borough of Saddle River, 60 N.J. Super. 367 (Law Div. 1960)). In Barrett, this court affirmed a trial court's decision to invalidate an ordinance and disqualify a township official from voting on an amendment that would allow a continuing care facility to be constructed in the community. 230 N.J. Super. at 196-98. The township official played critical roles in adopting the amendment while serving on both the township committee and planning board. Id. at 198-99. His mother, however, lived in a nursing home that was owned by the proprietors of the proposed continuing care facility. Id. at 199. Because the official's mother was a Medicaid patient, he was not financially responsible for her care and, therefore had no pecuniary interest in the amendment. Id. at 200.

This court determined that a pecuniary interest is not required to find a disqualifying conflict, if a public official is personally interested in the matter:

> The statutory disqualification is markedly broadly couched, extending to personal as well as financial interest, "directly or indirectly." There is thus evidenced an intent that the bar is not confined to instances of possible material gain but that it extends to any situation in which the personal interest of a board member in the "matter" before it, direct or indirect, may

24

have the capacity to exert an influence on his action in the matter.

[Id. at 202 (emphasis omitted) (quoting Zell v. Borough of Roseland, 42 N.J. Super. 78, 81 (App. Div. 1956)).]

Where a township committee member's present, tangible interest threatens to influence his or her decision on the subject of a vote before the committee, that member should not be involved in the matter, and their participation requires invalidation of the ordinance. Grabowsky, 221 N.J. at 556 (citing Barret, 230 N.J. Super. at 200); see also McNamara, 60 N.J. Super. at 376, 378 (finding a disqualifying interest based on a committee member's "well developed and intense private concern" which "could have impaired his capacity to act in the interest of the citizens at large.").

Barrett and McNamara support the proposition that publicly perceived emotional and psychological considerations can be the basis of a disqualifying personal interest. The critical issue in this case is whether Wolfe's personal interest—his animosity for plaintiff—could reasonably be perceived by the public as having the capacity to impair his ability to perform his sworn public duty—the faithful and impartial review of the 2019 Amendments. Wolfe demonstrated the extent of his bias in his public statements and conduct leading up to and after the June 13, 2019 public hearing.

25

During the November 29, 2018 public hearing regarding plaintiff's then-pending helistop application to the NJDOT, Wolfe requested to speak "as a member of the public" and accused plaintiff of "being a bad neighbor" for filing tax appeals; told the audience plaintiff was giving members of the Township a "giant middle finger"; proclaimed he would never patronize The Ridge or donate or vote for any politician or organization that did; and vowed to do what he could to make plaintiff's life a living hell.

Subsequently, Wolfe helped to draft the proposal for the 2019 Amendments which essentially eliminated all of the ancillary uses approved just three years earlier and reclassified golf courses from a permitted to a conditional use. Because The Ridge is the only golf course in East Amwell, plaintiff was the only resident of the Township that would be affected. Prior to the June 13, 2019 public hearing, Wolfe also authored and posted to the Township's website a report in which he made unsubstantiated allegations that The Ridge's original site plan approvals, as well as the 2016 Amendments, were the product of corrupt dealings between plaintiff and former Board and Committee members. At the June 13, 2019 public hearing, Wolfe, who was the only member of the Committee that addressed the residents, gave a speech that encompassed fifty pages of transcript, during which he repeated his criticisms of plaintiff's tax

A-3710-19

appeals and helistop applications, and accused plaintiff of making false statements under oath and bribing Township officials. Any one of these statements or actions, viewed on its own, would not be a sufficient basis for a resident to reasonably perceive a disabling conflict of interest. Viewed together, however, Wolfe's conduct and statements give the appearance of a deeply held personal bias.

The public perception of Wolfe's bias was demonstrated at the June 13, 2019 public hearing. There, residents of East Amwell made several statements communicating their concern for Wolfe's improper motive behind the 2019 Amendments:

> MR. MILLER: I don't know exactly what issue the [T]ownship or a certain person has with this individual.
>
> . . . This is a vile, evil, disgraceful, vindictive amendment . . . .
>
> . . . .
>
> . . . This is the result of one person saying ["]I am going to make another person's life a living hell.["] . . . [I]s this really good for the [T]ownship? This silly, [insane] crap that is in here to be [vindictive] against one person?
>
> MEMBER OF THE PUBLIC: You're putting things in there that are ridiculous. And I'm hoping, okay, they err on the side of caution here and get a little back bone. And if . . . it's better for the town, for the greater good

to recuse yourself, show that you're going to support the people of East Amwell . . . .

MR. WEITZER: So as I sit here today and hear both sides, I feel like it's national politics, and it's no longer about law or anything else. It's just a personal vendetta. One side hates the other. And you know, I ask, when . . . did the politics stop being about working for the town and people. It's just like a personal vendetta.

And I understand you may not like Mr. Moore, and trust me, I get it. But I just feel the two sides are going after each other. And you know you are trying to hurt Mr. Moore and the Ridge.

The statements made by residents at the public hearing demonstrate that not only did the circumstances of Wolfe's participation have the capacity to displace the public's confidence in his integrity to perform his sworn public duty, they actually did.

Defendants correctly point out that in order for a public official to be disqualified by a personal interest from voting on a zoning amendment, the interest must be distinct from those shared by members of the general public. Grabowsky, 221 N.J. at 555. "Our courts have rarely recognized a conflict of interest arising from a public employee's alleged direct personal interest or personal involvement in a matter when there is no prospect of financial advantage to the public official or his or her family or friends." Ibid. However, there is no evidence to suggest that the personal interest in this case—Wolfe's

A-3710-19

disdain for plaintiff—was shared by residents of East Amwell. We have no doubt that opposition to plaintiff's helistop application and tax appeals shared broad public support. Nor do we doubt that some residents of East Amwell were in favor of the 2019 Amendments. The record suggests, however, that the degree of Wolfe's apparent contempt for plaintiff was unprecedented in the community.

Wolfe was not the only member of the Committee to speak out against plaintiff's helistop application and tax appeals at the November 29, 2018 public hearing. The now-former-but-then-current Mayor Timothy Mathews also addressed the audience. He made statements that were critical of plaintiff, but did so in a manner that did not give the appearance of a deeply held and intense bias:

> [MAYOR MATHEWS]: I know people who do play there. And Joel Moore should be very proud of his golf course. It's a first class course. He has done a great job. But in my opinion, however, The Ridge and Joel . . . [are] not acting like a good neighbor.
>
> . . . So to some degree, we have created I think someone said you know you – he keeps coming to the well and we keep giving. And I don't think that is very neighborly.
>
> . . . We get no benefit [from] the golf course. There's no East Amwell day. There's no bring [your] friends day. There's no give the fire house a free round of golf day. As far as I know. There's no benefit to the hotel there. We all have homes. We're not going to

29

stay there. There's no benefit to the swimming pool, we're not members right. There's no benefit to the hydrated tennis courts. However[,] it's detrimental that someone testified that . . . is going to use up a quarter million more gallons of water, if it's done. That's coming out of the same well that we are all drinking out of. We are just a bunch of straws going into the same aquifer.

So instead of thanking the community for these zoning concessions we are here in litigation as [Wolfe] said today, the trial starts tomorrow we are in court tomorrow. [East Amwell Township v. The Ridge], because The Ridge feels their taxes are too high. Now they want them to . . . be cut in half and expect the residents of East Amwell to pick up the tab. They expect us to subsidize that golf course. That is what it would be because if their taxes go down, ours go up because the budget is the budget and you [have] got to come up with the same amount of dollars. . . .

. . . So I ask the Ridge and specifically Joel, Joel if you are watching, I ask[, "]how do these impactful add ons to the original agreement[,] both spirit and legal agreement with this township, benefit the residents of East Amwell?["]

I would like to hear how they benefit us. And as I stated earlier[,] neighbors share each [other's] success. So how does East Amwell share in Joel's success with his golf course. You are not being a good neighbor, Joel. And I would be happy to chat with you [offline] about it. Thank you.

A comparison of Wolfe's and Mathews' statements reveals a stark contrast in decorum and vitriol. The former Mayor's statements represent the opinion of

30

an elected official, on an interest shared in common with members of the public.[4] Conversely, Wolfe's statements give the appearance of an elected official with a deeply held personal bias against a member of his community that likely had the capacity to influence the performance of his sworn public duties. That distinction is supported by the comments residents made at the June 13, 2019 hearing, in which Wolfe was singled out for carrying out a personal vendetta. In stark contrast, none of the former Mayor's statements were specifically referenced that night.

"Requiring recusals when appropriate does not discourage public-spirited citizens from serving on boards. Dedicated public servants—given the proper guidance—will not want to sit in judgment if they are encumbered by a potential conflict." Piscitelli, 237 N.J. at 353. In that regard, finding Wolfe's personal bias precluded him from participating in matters affecting The Ridge does not impede or handicap the operation of East Amwell's local government, it facilitates it.

With respect to defendants' argument that plaintiff's motion was prematurely decided because there were outstanding disputes of material fact,

---

[4] Plaintiff's amended complaint in lieu of prerogative writs did not request that the court enjoin Mathews from participating in matters affecting The Ridge.

they conceded that the recusal issue was ripe for decision at oral argument, and by filing their cross-motion for summary judgment. Liberty Surplus Ins. Corp. v. Nowell Amoroso, 189 N.J. 436, 450 (2007) ("When both parties to an action 'move[] for summary judgment, one may fairly assume that the evidence was all there and the matter was ripe for adjudication.'" (alteration in original) (quoting Morton Int'l, Inc. v. General Accident Ins. Co of Am., 266 N.J. Super 300, 323 (App. Div. 1991))). Accordingly, we find no error in the judge's decision to grant plaintiff's motion.

Because we conclude Wolfe was disqualified from voting on the 2019 Amendments, we also conclude that his participation requires their invalidation. See Griepenburg v. Twp. of Ocean, 220 N.J. 239, 253 (2015).

To the extent not addressed, defendants' remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION